**In re CONSOLIDATED OPERATING PARTNERS L.P., a Delaware Limited Partnership, Debtor.**

**Bankruptcy No. 87 B 02896 C.**

United States Bankruptcy Court, D. Colorado.

Sept. 22, 1988.

Glen E. Keller, Jr., Douglas W. Jessop, Davis, Graham & Stubbs, Denver, Colo., for debtor—Consolidated Operating Partners L.P.

James B. Holden, Sherman & Howard, Denver, Colo., for creditor—First Interstate Bank of California and First RepublicBank Dallas, Nat. Ass'n.

## ORDER ON MOTIONS TO REQUIRE DEBTOR TO PAY ALL GENERAL UNSECURED CLAIMS PRIOR TO CONFIRMATION AND FOR VALUATION OF SECURED CLAIM

PATRICIA ANN CLARK, Bankruptcy Judge.

This matter comes before the Court on the motions of the First Interstate Bank of California and First RepublicBank Dallas, National Association (the Lenders) seeking to require the debtor to pay all general unsecured claims prior to confirmation of a plan of reorganization and for valuation of the Lenders' secured claim.

The Lenders assert that the primary objective of the bankruptcy laws is to maximize the repayment of general unsecured creditors and to repay unsecured creditors at the earliest possible date. To achieve that objective the Lenders contend that the Court should impose limitations and conditions on the operation of debtor's business pursuant to 11 U.S.C. §§ 105, 1107 and 1108. The Lenders propose that the Court require debtor to satisfy unsecured creditors prior to the confirmation of the plan through the use of proceeds from the sale of property or by the acceptance of a non-interest bearing cash advance from Lenders sufficient to pay the unsecured creditors. Lenders further contend that the payment to unsecured creditors should be made to avoid artificial circumvention of 11 U.S.C. § 1129(a)(10). The debtors assert that preconfirmation payment of unsecured creditors by a forced loan from a secured creditor violates the provisions and policies of the Bankruptcy Code.

As for the valuation of Lenders' secured claim, the Lenders maintain that they are entitled to interest accrued at the Late Payment Rate from the date of the debtor's prebankruptcy default to the effective date of confirmation of a plan. The Lenders assert that the debtor is solvent and hence, the equities dictate payment of interest at the Late Payment Rate. The Lenders submit that 11 U.S.C. § 506(b) allows default interest to be paid. The debtor disputes the imposition of any interest at the Late Payment Rate. The debtor con-

tends that the default interest provision must be construed as a penalty under Texas law. The debtor asserts that even if the default interest provision is not a penalty, the Lenders are not entitled to receive late payment interest as it is inequitable and that here the Late Payment Rate is prohibited by Section 506(b). Alternatively, the debtor asserts that the Lenders have waived their claim for default interest and they are estopped from claiming any default interest.

The essential facts are as follows. The debtor filed a Chapter 11 petition on March 17, 1987. The Lenders' claims total approximately 99 percent of all claims and the general unsecured claims total approximately 1 percent. The Lenders tendered to the Court a plan to liquidate the debtor on July 20, 1987. The debtor has tendered several non-liquidating plans to the Court. The debtor's scheduled value for the property securing the Lenders' claims is $74,-200,000 and the scheduled liabilities of the debtor total $46,787,510.46. The parties agree that the debtor is solvent.

The Lenders each hold a promissory note (the Notes) signed by debtor pursuant to an October 15, 1985, credit agreement, as amended. The Notes each provide that "[a]ll past due principal of and past due interest on the Loan shall bear interest on each day outstanding at the Late Payment Rate in effect on such day, and such interest shall be due and payable immediately as it accrues." The credit agreement defines the Late Payment Rate as the Base Rate plus 4 percent per annum. The Base Rate is defined in the credit agreement as each Lender's prime rate plus a specified spread which increases slightly at various points throughout the term of the loan. Pursuant to the Note, debtor should have made a $10 million principal payment to the Lenders on March 2, 1987. The debtor failed to make that payment and has made no such payment to the present date. The Lenders advised the debtor by letter on March 2, 1987, of the existence of a default, demanded performance and stated that the Late Payment Rate was in effect for the $10 million principal payment. In addition, the Lenders advised the debtor that the Lenders had not yet accelerated, and that the Lenders reserved the right to accelerate the obligations if the debtor failed to cure by March 16, 1987.

Pursuant to a stipulation and agreement regarding limited use of cash collateral signed on April 20, 1987, the debtor has paid the regularly scheduled interest payments at the Base Rate to the Lenders. The stipulation and agreement specifically reserved the rights of the Lenders to assert a claim for interest at the Late Payment Rate and did not waive any default. The debtor also reserved its right to contest the validity of the Late Payment Rate.

■ As to the issue of the Lenders' request for an order requiring the debtor to pay general unsecured claims, this Court finds that the debtor cannot be forced to pay off pre-petition unsecured creditors prior to confirmation as it thwarts the debtor's ability to obtain confirmation of a plan. There is no Code provision or case authority supporting the Lenders' motion. In essence, the Lenders want to eliminate the unsecured class which would leave them in complete control of the bankruptcy proceedings in contravention of the policy of the Bankruptcy Code.

■ The primary purpose of Chapter 11 is to rehabilitate a going business, not, as the Lenders contend, to maximize the repayment of general unsecured creditors. *See generally,* Legislative Statement offered by Representative Edwards as Chairman of and by and on behalf of the Subcommittee on Civil and Constitutional Rights of the house Committee on the Judiciary, Cong.Rec. H11100–02 (daily ed. September 28, 1978). As the Fifth Circuit stated in *In re Nite Lite Inns,* 17 B.R. 367, 370 (Bankr.S.D.Cal.1982),

The primary purpose of the reorganization chapters of both the Act and the Code has been to promote restructuring of debt and the preservation of economic units rather than a dismantling of the estate ... [T]he primary focus and effort of a Chapter 11 proceeding should be a reorganization. Liquidation plans should be secondary concerns unless the

debtor chooses such a course of action or the necessities of justice require the confirmation of a liquidation plan.

Congress did not intend that a secured creditor could, in essence, force the purchase of an unsecured claim by the debtor on behalf of the lender. The debtor seeks to retain its funds rather than pay off unsecured creditors in order to continue its business so that it may have an opportunity to obtain confirmation of its plan. The Court will not use its powers under 11 U.S.C. §§ 105, 1107 and 1108 to issue orders in contravention of Congressional intent.

■ The Lenders' allegation that 11 U.S.C. § 1129 is being artificially circumvented because the debtor is able to cash out the impaired unsecured claimants' amounts to an assertion of bad faith. In determining that the debtor is not acting in bad faith, the Court is guided by *In re Sun Country Development, Inc.,* 764 F.2d 406 (5th Cir.1985). There the secured creditor contended that the plan was not submitted in good faith because the debtor changed the unsecured creditors' status from unimpaired to impaired so that the unsecureds could approve the plan and the debtor could effectuate a cram down. The Fifth Circuit did not find bad faith, noting:

> Where the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of section 1129(a)(3) is satisfied. *Id.* at 408.

The court confirmed the plan, stating:

> Congress made the cram down available to debtors; use of it to carry out a reorganization cannot be bad faith. *Id.*

Thus, as the debtor's proposed plan is consistent with the criteria noted above, the debtor is not acting in bad faith by impairing its unsecured creditors.

The other issue before the Court is whether the Lenders are entitled to default interest on the past due Notes. When the debtor is solvent, the equities dictate that additional interest be paid to the secured creditor rather than to the debtor. *Vanston Bondholders Protective Committee v. Green,* 329 U.S. 156, 164, 67 S.Ct. 237, 240–41, 91 L.Ed. 162 (1946); *Ruskin v. Griffiths,* 269 F.2d 827 (2d Cir.1959) *cert. denied,* 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed. 2d 381 (1960); and *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 791 F.2d 524 (7th Cir.1986).

The enforceability of the interest term in the credit agreement is governed by state law and policy. *In re Tastyeast, Inc.,* 126 F.2d 879, 881–882, 881 (3rd Cir.) *cert. denied, Modern Factors Company v. Tastyeast, Inc.,* 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942), *Black Ranches, Inc. v. Strand,* 362 F.2d 8, 16 (8th Cir.1966); and *United Merchants and Manufacturers v. Equitable Life Insurance Society,* 674 F.2d 134, 141 (2d Cir.1982).

■ The Court finds that the default interest rate does not constitute a penalty under Texas law. By statute, Texas permits parties to any contract to agree on an interest rate as long as that rate does not exceed the statutory usury ceiling.[1] The usury ceiling varies between 18 percent and 28 percent per annum, depending on the current rate for Treasury bills. Even the lowest usury ceiling, 18 percent, is substantially in excess of the Lenders' Late Payment Rate, which floats with prime and currently is 14.125 percent per annum.

Texas also upholds contracts or promissory notes that contain specific default interest rates that are higher than the pre-default interest rates. *E.g., Dixon v. Brooks,* 678 S.W.2d 728 (Tex.Civ.App. 14th Dist. 1984).

---

1. Tex.Rev.Civ.Stat.Ann. Art. 5069–1.04(f) provides the general rule for determining interest rates on any contract. That article provides as follows:

> The parties to any contract, including a contract for an open-end account, may agree to and stipulate for a rate or amount by contracting for any index, formula, or provision of law, by or under which the numerical rate or amount can from time to time be determined. However, the rate or amount so produced may not exceed the ceiling that may from time to time be in effect and applicable to the contract, for so long as a debt is outstanding under the contract.

Section (a) of the same article specifies the usury ceiling discussed in Section (f).

The Court is not persuaded by the debtor's argument that in this instance strict adherence to the parties' interest rate is not required by 11 U.S.C. § 506(b). 11 U.S.C. § 506(b) gives an oversecured creditor the right to accrue interest at the rate provided for under the agreement between the creditor and its debtor. *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Calif.1987). The equities of this case do not favor any deviation from the imposition of the Late Payment Rate. The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11. No such result was intended by Congress. Under the circumstances of this case, the debtor should be held to the Late Payment Rate agreed to prior to the debtor's bankruptcy filing.

Finally, this Court finds no merit in debtor's argument that the Lenders' words and conduct constitute waiver and estoppel on the issue of late payment interest. The Lenders asserted their claim for the Late Payment Rate in the default letter sent to debtor prior to the bankruptcy filing and at various times thereafter, including the parties' cash collateral stipulation.

The Court finds that the Lenders are entitled to interest at the Late Payment Rate pursuant to their contract with the debtor. The Lenders are entitled to the Late Payment Rate on the $10 million principal payment default from March 2, 1987, through March 16, 1987, the end of the arbitrary cure period set by Lenders. The debtor's filing of its bankruptcy petition accelerated the Notes automatically. *See In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr.1984) *aff. in part* and *rev. in part*, 60 B.R. 403 and *cases cited therein*. Therefore, the Late Payment Rate shall be applied on the entire principal balance from March 17, 1987, through the effective date of a confirmed plan or until some other disposition of the secured claims may occur in the debtor's bankrupt-cy case, less any payments made after March 17, 1987.[2] It is, therefore,

ORDERED that the Lenders' motion for an order requiring payment of general unsecured claims is denied.

FURTHER ORDERED that the Lenders' secured claims are to be valued in a manner consistent with this opinion.

FURTHER ORDERED that all questions related to the inclusion of reasonable fees, costs, and charges in the secured claims are reserved for determination at a later date.

---

**2.** The Court recognizes the debtor's right to de-celerate this debt under 11 U.S.C. § 1124(2).