**In re Mark C. HOLLSTROM, D.C. and Susan Renee Hollstrom d/b/a Hollstrom Chiropractic Clinic, Debtors.**

**Bankruptcy No. 90–B–06810–A.**

United States Bankruptcy Court, D. Colorado.

Nov. 14, 1991.

Tom H. Connolly, Denver, Colo., Chapter 7 trustee.

Lisa K. Shimel, Denver, Colo., for Omnibank Leetsdale.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court *sua sponte.* The issue presented to the Court is whether the secured creditor is entitled to a thirty-six percent (36%) default rate of interest on its oversecured claim pursuant to 11 U.S.C. § 506(b).[1] The Court, after hearing and having reviewed the file and being advised in the premises, makes the following findings of fact, conclusions of law, and order denying the creditor's claim for default rate interest charges.

### I. *Background.*

On May 25, 1990, Debtors herein filed a Voluntary Petition pursuant to Chapter 7 of the Bankruptcy Code. At the time the Petition was filed, Debtors were indebted to Omnibank Leetsdale ("Omnibank") under the terms of a promissory note and security agreement dated June 22, 1989 in the face amount of $110,000 ("the Note"). Omnibank properly perfected its security interest in the furniture, fixtures, equipment and accounts receivable of the Debtors' chiropractic business.

An Order Approving Stipulation and Agreement for Immediate Relief from Automatic Stay and to Prohibit Use of Cash Collateral was issued on July 2, 1990 relating to Omnibank's collection of accounts receivable. On August 15, 1990, at the request of the parties, this Court entered an Order for Relief from Automatic Stay and for Abandonment of the furniture, fixtures and equipment.

Some time later, on June 17, 1991, this Court received what purported to be an accounting of the secured claim held by Omnibank which indicated that the secured claim of Omnibank was satisfied in whole or in substantial part by the sale of the physical assets and/or collection of accounts receivable. This Court, concerned about the reasonableness of the expenses charged by Omnibank and apparently incurred in collection, on June 21, 1991 ordered the Chapter 7 Trustee to submit a written statement of his evaluation, findings and conclusions regarding the Omnibank accounting and sale expenses.[2]

On August 5, 1991, the Chapter 7 Trustee filed a statement ("Accounting Settlement") essentially approving of many of the Omnibank expenses, but expressing

---

1. "To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b).

2. In addition to Omnibank's attorneys' fees and costs of "approximately $20,000.00," Omnibank assessed "collection charges" of $19,471.28, principally on the sale of personal property for $60,214.00 and collection of accounts receivable in the approximate amount of $99,850.00.

concern about the accounting method utilized by Omnibank in applying receipts to the outstanding debt balance. The Trustee and Omnibank agreed to reduce the charges by approximately $2,500.00. The Trustee also expressed reservations, but did not overtly oppose, the thirty-six percent (36%) default interest rate charged by ·Omnibank.

At the August 20, 1991 hearing on the issue, the Court requested that Omnibank submit a brief memorandum on the proper rate of interest to be utilized and took the matter under advisement. Omnibank filed a Memorandum Brief Regarding Post-Petition Default Interest on September 4, 1991. The Chapter 7 Trustee did not respond to the brief.

Omnibank maintains that through the Accounting Settlement, it reached a compromise with the Chapter 7 Trustee with respect to certain disputed items, primarily relating to the accounting method to be utilized. Omnibank originally applied the funds it collected from the collateral first to expenses, then to interest, and finally to principal. Omnibank subsequently agreed to apply the proceeds first to interest, then to principal, and only then to expenses. As part of the compromise with the Chapter 7 Trustee, Omnibank charged the default rate of interest as provided by the Note, 36%.[3] The Chapter 7 Trustee and Omnibank have agreed that if the compromise, the Accounting Settlement, is not accepted by this Court, Omnibank reserves the right to seek a hearing on the proper method of accounting.[4]

---

**3.** The Note provided for a pre-maturity, pre-default, variable interest rate based upon the prime rate, but in no event less than 12% per annum.

**4.** "Since May 15, 1990, the bank has continued to accrue interest at the default rate of 36% and has applied proceeds from collection first to the cost of collection, then to interest, then to principal. It appears that under the terms of the promissory note, the Bank must apply the proceeds of collection first to interest, then to principal, then costs. Under the Bank's method of calculation, approximately $12,000.00 of interest was charged after May 15, 1990, of which

## II. *Discussion.*

The Bankruptcy Code provides that an oversecured creditor, such as Omnibank, is entitled to "interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). The United States Supreme Court has determined that the phrase "interest on such claim" is not limited by the subsequent language "provided for under the agreement under which such claim arose." 11 U.S.C. § 506(b). *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). The Supreme Court found that the plain meaning of the Bankruptcy Code supported its interpretation and that statutory language should be conclusive, except where literal application of a statute would produce results clearly at odds with the intention of the drafters. *Id.*, at 242–243, 109 S.Ct. at 1031.

Clearly, Section 506(b) should be construed to include reference to interest at the contract rate. This conclusion, however, does not settle the issue as to default rates "since … the Supreme Court has held that contractual and other legally-established rights may sometimes conflict with equitable principles of distribution under the bankruptcy laws." *In re W.S. Sheppley & Co.*, 62 B.R. 271, 274 (Bankr. N.D.Iowa 1986) (discussing *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946) and *American Surety Co. v. Sampsell*, 327 U.S. 269, 66 S.Ct. 571, 90 L.Ed. 663 (1946).[5] *Accord, e.g., In re DWS Investments, Inc.*, 121 B.R. 845, 849 (Bankr.

---

$8,000.00 was a result of applying the default rate." Report of the Trustee Concerning Liquidation of Collateral by Omnibank filed August 5, 1991, page two. Omnibank maintains that the total interest charged at the default rate of interest since the Petition date is "only $1,157.00."

**5.** *American Surety Co. v. Sampsell*, 327 U.S. 269, 66 S.Ct. 571, 573, 90 L.Ed. 663 (1946) held that contractual and statutory rights under state law need not be applied literally in a bankruptcy proceeding when to do so would produce an inequitable result.

C.D.Cal.1990) ("A reading of § 506(b) is not helpful despite the Supreme Court's guidance in statutory construction … in *Ron Pair*.").

It is manifest that the touchstone of each such decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditor and the debtor.

*Vanston Bondholders, supra* 329 U.S. at 165, 67 S.Ct. at 241.

■ The issue thus remains, is this Court bound to apply the default interest rate that the parties agreed to when contracting, or does the flexibility exist to enable this Court to balance the equities in determining the applicability of the contract default rate?

Omnibank urges strict construction of the contract and, consequently, allowance of the 36% default interest rate. Four cases are cited in support of this position. In *Matter of Henry*, 87 B.R. 303 (Bankr. D.Del.1988), the Court refused to utilize equitable principles to reduce the statutory interest rate of 18% claimed by a mortgagee on a state court default judgment entered in a foreclosure action against a debtor's residence. In *Matter of 268 Ltd.*, 789 F.2d 674 (9th Cir.1986), the court, *in dicta*, states that "[t]he interest provision is not subject to the reasonableness limitation. When an oversecured creditor seeks interest on his or her claim, the bankruptcy courts apply the security agreement's interest rate." *Id.*, at 676 (citing two cases, neither of which address a default interest

rate).[6] Neither *Henry* nor *268 Ltd.* are conclusive on the issue at bar because neither case expressly involves a default rate of interest.

The other two cases cited by Omnibank are more directly on point. In *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Cal.1987), the court recognized that "[n]either bankruptcy law nor its legislative history makes any reference to the legitimacy of a default rate of interest" but went on to conclude that "[n]either bankruptcy law nor non-bankruptcy federal or state law requires or permits the Court to set aside the agreement on interest that the parties have made." *Id.*, at 509–511. The court in *Skyler Ridge* did, however, specifically find that the 14.75% default interest rate was negotiated by the parties and fell "well within the range of interest rates that the Court has seen frequently in recent years." *Id.*, at 511. Almost as an afterthought, the court added an exception to its purported strict construction,

Debtor has not attacked the default interest rate on the grounds of unconscionability or of usury, and the court does not reach these issues. Apart from usury and unconscionability, the court has no power to determine the reasonableness of a default interest rate.

*Id.*, at 511.

■ Similarly, in *In re Consolidated Operating Partners L.P.*, 91 B.R. 113 (Bankr.D.Colo.1988), Judge Clark determined that the enforceability of the interest terms is governed by state law and policy.[7] The default interest rate of 14.-

---

**6.** *Matter of 268, Ltd.*, 789 F.2d 674 (9th Cir. 1986), dealt expressly with the enforceability of a provision in a deed of trust that allowed, in the event of default by the debtor and sale of the security by the secured creditor, five percent of the balance which remained outstanding at the time of default to be paid to the secured creditor as attorney's fees. "[The secured creditor] reads the fee provision [of Section 506(b)] as the interest provision is read, thus ignoring the express reasonableness limitation imposed on fees." *Id.*, at 676.

**7.** This Court has previously approved default interest at 24% based, primarily, on state law. *In re Wood Family Interests*, No. 87–B–12731–M (Bankr.D.Colo. May 24, 1989). The question of

whether a provision for default interest is, in fact, a penalty is governed by state law and state policy. *In re Tastyeast*, 126 F.2d 879, 881–882 (3rd Cir.), *cert. denied*, 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942). In a non-bankruptcy context, the Colorado Supreme Court has found that a default rate of interest which doubled the six percent contract rate of interest was not unreasonable and should be enforced under the circumstances. *McKay's Estate v. Belknap Savings Bank*, 27 Colo. 50, 55, 59 P. 745, 747 (1899). Even though the increased interest rate is not usurious under state law, it may nevertheless constitute a penalty unless the amount is proportionate to any damage reasonably anticipated under the circumstances. *Tastyeast, supra* at 882.

125% was found to be substantially below the applicable state law usury ceiling.[8] Furthermore, Judge Clark expressly found that

> The equities of this case do not favor any deviation from [the default rate of interest]. The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor.... No such result was intended by Congress. **Under the circumstances of this case**, the debtor should be held to the [default rate of interest] agreed to prior to the debtor's bankruptcy filing.

*Id.*, at 117 (emphasis added).[9]

One common thread emerges from an examination of these cases: No court which directly addresses the issue appears willing to rule out the possibility that certain circumstances might necessitate an equitable deviation from the stated contractual default rate of interest, and there is no clear, emerging, definite enumeration of these special circumstances or equitable considerations. As no Tenth Circuit decision addresses the subject,[10] this Court must evaluate and apply the law to the particular facts before it.

This Court chooses to adopt the Supreme Court's flexible approach initially set forth in *Vanston Bondholders, supra* and later adopted by other courts. *See, generally, Sheppley & Co., supra* at 278. "Usually, the court should apply the contract rate, but it has the power to apply a different rate depending upon equitable considerations." *DWS Investments, supra* at 849. This Court is asked to accept and approve a default interest rate of 36% which, it may be reasonably inferred in a bankruptcy situation, seems excessive.[11]

No evidence has been presented to justify the 36% rate of interest. There has been no showing that the rate approximates the market rate or default rate for similar loans with borrowers in similar circumstances.[12] The default rate of interest has not been established as having any relationship to actual or projected loss as a result of nonpayment. *Accord, DWS Investments, supra* at 849 ("A default rate of gained for default interest rate [sic] without examining the reasonableness of these rates **provided they fall within the range of acceptable rates** ... the default rate here was not shown to fall outside the range of default rates applied commercially, nor dies it **shock the conscience of the Court.**") (emphasis added). *Accord, In re Presque Isle Apartments, L.P.,* 109 B.R. 687, 689 (Bankr.W.D.Pa.1990) ("It is not illegal to provide for a higher rate of interest after maturity, but if such rate is unconscionably high, it will be unenforceable because it amounts to a penalty. [Citations omitted.] To allow the Bank interest at the criminal usury rate would clearly be unconscionable and unenforceable as a penalty.") (The criminal usury rate in New Jersey, the law at issue, was 50% for a corporation and 30% for an individual).

---

In the bankruptcy context, where the debtor is solvent and, therefore, the unsecured creditors would not be harmed by the imposition of a higher interest rate and the contest over default interest involves only a creditor and a stockholder/debtor, payment of the default rate of interest may be proper. *Ruskin v. Griffiths,* 269 F.2d 827, 831–832 (2nd Cir.1959). *See generally, In re Wood Family Interests, supra* (where this Court allowed a 24% default interest provision in circumstances substantially similar to those facing the *Ruskin* court). In the case at bar, however, while Omnibank is oversecured, Debtor is most certainly not solvent. All of the creditors will not be fully paid. The distinction drawn by the Second Circuit from *Vanston* does not, therefore, apply.

8. Under Texas law, "[t]he usury ceiling varies between 18 percent and 28 percent per annum, depending on the current rate for Treasury bills." *In re Consolidated Operating Partners L.P.,* 91 B.R. 113, 116 (Bankr.D.Colo.1988).

It should be noted that the commercial usury rate at issue in the case *sub judice,* is substantially higher than the statute considered by Judge Clark. *See,* 8B C.R.S. § 18–15–104(1) (criminal usury, a class 6 felony, to assess a 45% annual percentage rate of interest).

9. *See also, In re Schaumburg Hotel Owner Ltd. Partnership,* 97 B.R. 943, 951 (Bankr.N.D.Ill. 1989) ("A court should allow contractually bar-

10. *Accord, In re Crabtree,* 113 B.R. 723, 724 n. 1 (W.D.Okla.1990).

11. It is interesting to note that the Court in *In re DWS Investments, Inc.,* 121 B.R. 845 (Bankr. C.D.Cal.1990) found a 25% default interest rate excessive. This Court is faced with a 36% rate.

12. "The Courts have rejected the proposition that the debtor's bankruptcy makes it uncreditworthy so that a higher than market rate should be imposed." *In re Pinebrook, Ltd.,* 85 B.R. 160, 162 (Bankr.M.D.Fla.1988).

interest should not be a penalty. Rather, it should be a means for compensating the creditor for any loss resulting from the nonpayment of principal at maturity".)[13] Moreover, Omnibank has received 100% reimbursement, full payment, on all its collection expenses.

This Court notes that very few cases have dealt with an interest rate that is as high as the one at issue here. One of the few is *In re White*, 88 B.R. 498 (Bankr. D.Mass.1988). In *White* the court was faced with a default interest rate of 48% between what the court found to be two very unsympathetic parties.[14] Finding first that the loan was not subject to the state usury statute, the court held that the debtors "must convince the Court that the default interest provision is an unconscionable penalty unenforceable under state law ... because the Supreme Court has determined that a bankruptcy court is not empowered to give a creditor rights that state law withholds." *Id.*, at 510 (citing *Butner v. U.S.*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). After examining Massachusetts law, the court stated:

> The Court is convinced that if the default rate of interest sought ... were reasonable a state court and this Court would have no trouble enforcing it. However, the Court finds that the default rate at issue here is nothing more than a device (akin to a sledgehammer) to coerce the Debtors into prompt payment.... The Court is **simply unable to conclude that the default interest provision at issue here represents anything close to a reasonable estimate of ... actual damages.** *Id.*, at 511 (emphasis added).

Sight must never be lost of the fact that these Debtors are in bankruptcy; there are too many creditors chasing too few dollars.

While it is clear that courts must look to the underlying contract as the initial focal point, it is equally clear that after bankruptcy, it is § 506(b), not state law, through which that look is focused, and that examination must view not only the contours of § 506(b) but also the broader penumbra of bankruptcy law.... Contracts do not exist in a vacuum. Their life and meaning depend upon the legal environment in which their enforcement is sought, and it is a fact of life that after bankruptcy a creditor's rights are more restricted because of the codified public policy of giving a debtor an opportunity to attempt to reorganize.

*In re Wonder Corp. of America*, 72 B.R. 580, 588 (Bankr.D.Conn.1987), *aff'd* 82 B.R. 186 (D.Conn.1988).

'There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimented [sic] to the policy of the bankruptcy laws.' ... While a default rate may well not constitute a penalty, as between the secured creditor and the debtor, under state law and for state law purposes, that conclusion does not answer the *federal* question of relative distributive rights of creditors in a reorganization proceeding.... '[A]ppropriate regard' should be given to the state law but the distribution in bankruptcy 'is in the last analysis a matter of federal law.'

*W.S. Sheppley, supra* at 278 (emphasis in original) (quoting *In re Briggs Transportation Co.*, 780 F.2d 1339, 1346–1347 (8th Cir.1985)) and *American Surety, supra.*

*Accord, In re 360 Inns, Ltd.*, 76 B.R. 573, 584 (Bankr.N.D.Tex.1987) ("legally estab-

---

**13.** There is no showing that a 36% rate of interest is conventional, reasonable, or the standard in the industry. There is no evidence whatsoever of the "balance of equities between creditor and creditor or between creditor and the debtor" referred to by the Supreme Court in *Vanston*. *Vanston, supra* 329 U.S. at 165, 67 S.Ct. at 241.

**14.** The court characterized the situation as follows:

"White is now asking the Court to undo his improvidence in entering into the loan transaction, to defeat Wedgestone's expectations whether reasonable or not, and to pave his exit from bankruptcy with a windfall. Wedgestone, on the other hand, seeks hundreds of thousands of dollars in interest at a rate that shocks at least this Court's conscience."
*In re White*, 88 B.R. 498, 511 (Bankr.D.Mass. 1988).

lished rights may sometimes conflict with equitable principles of distribution in bankruptcy").

It is reasonable to conclude that an excessive default interest rate imposed by a secured creditor serves as a penalty, or hammer (maybe the "sledgehammer" referenced by the court in *In re White, supra*), as against other creditors, not the debtor, and specifically against unsecured creditors.[15] This is particularly true in a bankruptcy situation where the unsecured creditors are already probably taking a substantial hit on their claims.

Bankruptcy essentially is, after all, a process of equitably adjusting contending creditors' claims and rights, and effectuating a fair distribution of a debtor's property among those creditors.[16] A 36% default rate of interest which sweeps up virtually all proceeds in the estate for the secured creditor, leaving virtually nothing for other creditors, does not advance that process.

This Court concludes that the Code and applicable case law, the facts of this case, and the equitable principles of distribution among creditors in bankruptcy, compel disallowance of this secured creditor's 36% default interest rate. This conclusion is reinforced by the complete absence of any evidence submitted by the creditor that the default rate is reasonable, market-based, within the "range of acceptable commercial rates," or based on actual loss.

Accordingly, it is

ORDERED that Omnibank Leetsdale is allowed to apply interest to the post-petition amounts outstanding on its secured claim at the 12% non-default, contract rate of interest, only. All funds received and retained based on the default rate of interest, in excess of 12%, shall be remitted to the Trustee within ten (10) days after this Order becomes final and non-appealable.

---

**15.** Other courts faced with this type of situation have compared the market interest rate with the non-default interest rate as set forth in the contract. If the market rate is lower than the contract rate, then the courts have applied interest at the contract rate. On the other hand, if the market interest rate is higher than the contract default rate, then interest should be applied at the contract default rate. *See, DWS Investments, supra* at 850; *In re 433 South Beverly Drive,* 117 B.R. 563, 567 (Bankr.C.D.Cal. 1990); *360 Inns, supra* at 585. In the case before this Court, there is no evidence that the market interest rate is higher than the non-default contract interest rate, however, it is most certainly lower than the default contract rate.

**16.** "The parties cannot apply and consider state law alone without regard to the overriding concerns and fairness considerations involved in a bankruptcy situation. Indeed, once a bankruptcy proceeding has been instituted and [for example, a] lessee becomes a debtor in bankruptcy, a whole new set of laws is brought into play which can substantially affect parties' relationships and interests, often altering or restricting their rights and obligations." *In re Coal–X Ltd.,* 103 B.R. 276, 279–280 (D.Utah 1986), *aff'd* 881 F.2d 865 (10th Cir.1989).