**In re The BOARDWALK
PARTNERS, Debtor.**

**Julian P. FOSS, Movant,**

v.

**The BOARDWALK PARTNERS,
Debtor, Respondent.**

**Bankruptcy No. 93–07118–PHX–CGC.**

United States Bankruptcy Court,
D. Arizona.

June 30, 1994.

---

Mark S. Bosco, Bosco & DiMatteo, P.C., Phoenix, AZ, for movant.

John F. Emerson, Phoenix, AZ, for debtor.

Alan H. Zimmerman, Phoenix, AZ, for Commerce Bank.

Ronald J. Ellett, John T. Gilbert, Warner & Alvarez, Phoenix, AZ, for Edward Shapiro.

## MEMORANDUM OPINION AND ORDER RE: CREDITORS' APPLICATION TO DISTRIBUTE FUNDS

CHARLES G. CASE, II, Bankruptcy Judge.

### INTRODUCTION

This case presents the question of the appropriate rate of interest to be allowed an oversecured creditor pursuant to Section 506(b) when the credit agreement provides for an increased interest rate upon default.

### FACTS

The Debtor owned a 116 unit apartment complex in Glendale, Arizona. The property was subject to a first lien in favor of Julian Foss ("Foss") in the principal amount of $590,000 plus interest and attorneys' fees. The property was also subject to a second priority lien in favor of Commerce Bank in the amount of $235,000 plus attorneys' fees and costs.

On January 6, 1994, after notice and hearing, the Court approved the Motion of the Debtor to sell the property free and clear of all liens and encumbrances to Civic Asset Management, Inc. for $1,185,000. After closing on March 23, 1994, the net proceeds of $1,068,250.71 were deposited with the Clerk of the Court pending further Order on their

distribution. Both secured creditors filed applications for disbursement of funds from the sale proceeds. These applications were consolidated for hearing on May 16, 1994.

The note between the Debtor and Foss, the senior lienholder, provided for "contract" interest at the rate of 18% and "default" interest at the rate of 26%. In addition, the Foss note provided for "[s]uch sums as the Court may fix as attorneys' fees" and late charges of 15% of any late payment. The deed of trust securing the obligation provides for payment of "all costs, fees, and expenses *of this trust.*" (emphasis supplied). There is no specific provision in the note providing for payment of costs and expenses, other than the quoted language on attorneys' fees.

The note from the Debtor to Commerce Bank, secured by a second lien position, provides for a "contract" rate of 1½% over Commerce Bank's base lending rate, as that rate changes from time to time, with a minimum rate of 9.5%. In addition, the Commerce Bank note provides for a "default" rate of 5% in excess of the contract rate, but not less than 24%. The Commerce Bank note provides for payment of "all costs and expenses of collection and reasonable attorneys' fees incurred by the holder hereof on account of such collection."

Based upon these contractual provisions, Foss sought the following amounts in its Application for disbursement:

| | |
|---|---|
| Principal | $ 590,000.00 |
| Interest (at 26%) | $ 187,459.73 |
| Late Charges | $ 21,240.00 |
| Account Servicing Fees | $ 510.00 |
| Foreclosure and Trustee's Fees | $ 4,250.00 |
| Foreclosure Costs | $ 1,873.00 |
| Bankruptcy Fees | $ 6,631.25 |
| Bankruptcy Costs | $ 3,060.00 |
| TOTAL (as of 4/30/94) | $ 815,023.98 |

Likewise, Commerce Bank sought the following amounts:

| | |
|---|---|
| Principal | $ 235,000.00 |
| Interest (at 24%) | $ 64,044.41 |
| Attorneys' Fees | $ 3,276.75 |
| TOTAL (as of 4/1/94) | $ 302,321.16 |

Two objections were filed to the consolidated applications. The first was by Edward Shapiro, a creditor who claims to hold a third lien position on the property. Mr. Shapiro also filed an Application for distribution of funds together with a Motion to consolidate his application with the other two. No order was ever entered consolidating Mr. Shapiro's Application or otherwise setting it for hearing. A further objection was filed by the Unsecured Creditors' Committee. The gist of both objections is that the Court should disallow accrual of interest at the default rate to the two senior lienholders, thereby preserving value for Mr. Shapiro and the unsecured creditors.

At the May 16, 1994 hearing, the Court authorized the immediate disbursement of the principal amounts owed to the two senior lienholders: $590,000.00 to Julian Foss and $235,000 to Commerce Bank. This distribution was made from the Court's Registry on June 14, 1994. With these disbursements, continuing interest accrual has been stopped. The issue now before the Court is the disposition of the approximately $245,000.00 remaining in the Court's Registry.

## DISCUSSION

As a general rule, creditors in a bankruptcy proceeding are not entitled to receive interest which accrues post-petition. *See* 11 U.S.C. § 502(b)(2) (disallowing any claim for "unmatured interest.") An exception to this rule is contained in 11 U.S.C. § 506(b) which allows to a secured creditor whose claim is less than the collateral securing it "interest on such claim, and any reasonable fees, costs or charges provided for under the agreement under which such claim arose."

The precise punctuation and syntax of Section 506(b) was the subject of the Supreme Court's opinion in *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The Court in *Ron Pair* held that that portion of Section 506(b) which entitles a creditor to interest is separate from that portion which entitles the creditor to "reasonable fees, charges and costs." Therefore, the Court in *Ron Pair* held that a nonconsensual lienholder was entitled to receive post-petition interest notwithstanding the absence of an "agreement" between it and the debtor.

While *Ron Pair* clearly held that a creditor's entitlement to interest is not dependent upon an agreement, it did not address the question of the *rate of interest* to which a

creditor is entitled when there is an agreement. While there is no definitive Ninth Circuit authority on this subject, four cases touch on the subject. The first, *In re 268 Limited*, 789 F.2d 674 (9th Cir.1986) appears at first blush to require that interest be awarded to an oversecured creditor at the rate, or rates, stated in the contract. However, on closer reading, *268 Limited* is not decisive on this issue. In that case, decided prior to *Ron Pair*, the issue was whether the Court had the authority to review the reasonableness of attorneys' fees sought by an oversecured creditor under an agreement enforceable according to its own terms under applicable state law. The Court had no difficulty in deciding that the Court had such authority, given the express inclusion of the term "reasonable" in the last clause of Section 506(b). In contrast to the specific "reasonableness" language in the "costs and fees" clause of Section 506(b), the Court noted the absence of any reasonableness standard in the "interest" clause. This led the Court to conclude:

> The interest provision is not subject to the reasonableness limitation. When an oversecured creditor seeks interest on his or her claim, the bankruptcy courts apply the security agreements interest rate ... [the secured creditor] reads the fee provision as the interest provision is read, thus ignoring the express reasonableness limitation imposed on fees.

789 F.2d at 676.

This comment is the Ninth Circuit's only guidance on the issue of interest in the *268 Limited* case; the entire remainder of the opinion deals with the attorneys' fees issue. Since this comment is dictum and since it does not address the question presented here, *i.e.*, the availability of *default* interest as opposed to ordinary contract interest, *268 Limited* is not controlling.

This conclusion is further bolstered by the Ninth Circuit's opinion in *In re Entz–White Lumber and Supply, Inc.*, 850 F.2d 1338 (9th Cir.1988). Again, the issue presented in this case was not squarely addressed in *Entz–White*. *Entz–White* dealt with whether the payment of default interest could be avoided by the "cure" provisions of Sections 1123(a)(5)(G) and 1124(2) in a plan of reorganization.[1] *Entz–White* is instructive in that, in dictum in a footnote, the court states: "We continue, of course, to recognize bankruptcy courts' 'broad equitable' discretion" in awarding post-petition interest," citing *In re Anderson*, 833 F.2d 834 (9th Cir.1987).

The *Anderson* case involved an attempt by an oversecured creditor to recover more than its contract rate of interest where the contract did not provide for a higher post-default rate. The Ninth Circuit held that the Bankruptcy Appellate Panel's decision applying the contract rate post-maturity was within the broad equitable discretion of the bankruptcy courts. Again, the precise issue of whether a higher post-maturity or "default" rate of interest was available when contractually based was not addressed in *Anderson*.

Finally, in *In re Glenn*, 796 F.2d 1144 (9th Cir.1986), the debtor claimed that a creditor holding both an oversecured secured claim and a wholly unsecured claim was entitled to interest under Section 506(b) on its secured claim. Chiding the debtor for "relying on technical idioms rather than law," 796 F.2d at 1146, the Ninth Circuit held that the oversecured claim was entitled to accrued post-petition interest. Along the way, the court stated that "Section 506(b) ... allows post-petition interest at the contract rate." 796 F.2d at 1147. Although it is not entirely clear, it appears that the court's conclusion was based upon a reading of Section 506(b) contrary to the interpretation later adopted by the Supreme Court in *Ron Pair*. In any event, as with all of these cases, the precise issue of the availability of a default rate of interest was not discussed[2].

1. The rationale of *Entz–White* is not available to the Debtor in this case since, admittedly, no plan will ever be filed or presented for confirmation.

2. The Ninth Circuit in *Anderson*, 833 F.2d at 836, made a similar comment: "Although this section is ambiguous as to whether it restricts oversecured creditors to 'interest ... provided for under the agreement under which the claim arose,' or whether the court may select any interest rate, *we have suggested* that the terms of the sale agreement should control. *See In re 268 Limited,* 789 F.2d 674, 676 (9th Cir.1986)...." [Emphasis supplied] 833 F.2d at 836.

■ Taken together, and viewed in light of *Ron Pair*, these Ninth Circuit cases stand for the two-pronged proposition that an oversecured creditor is ordinarily entitled to interest at its contract rate pursuant to Section 506(b), although the court retains "broad equitable discretion" to determine an appropriate interest rate as circumstances require. None of these cases establishes a clear rule on the availability of interest at a default or post-maturity rate. Given this guidance, but lack of clear precedent, from the Ninth Circuit, decisions from other jurisdictions will be reviewed.

The analysis begins with *In re Laymon*, 958 F.2d 72 (5th Cir.1992), *reh'g den.* 964 F.2d 1145, and *cert. den. Crozier v. Bradford*, — U.S. —, 113 S.Ct. 328, 121 L.Ed.2d 247 (1992). At the Bankruptcy Court level, Judge Leif M. Clark examined the issue of the appropriate interest rate to be used in a Section 506(b) analysis in light of *Ron Pair*. The underlying note called for contract interest at 10%, with post-maturity interest "at the highest rate permitted by law—which is 18% in this case." *In re Laymon*, 117 B.R. 856, 857 (Bankr.W.D.Tex.1990). The creditor filed a motion requesting payment of interest, costs and fees under Section 506(b) and asserted that he was entitled to interest at the 18% penalty rate. Dissatisfied with the court's ruling that he was entitled to interest at the contract rate, the creditor sought reconsideration on the "default rate" issue. The debtor took the opportunity, in light of *Ron Pair*, to file a cross-motion to reconsider, asserting that the setting of appropriate interest rate is within the broad discretion of the Court, notwithstanding the contract.

On reconsideration, Judge Clark held that a secured creditor was entitled only to interest at the "legal rate" regardless of what the contract said:

> Left unanswered [by *Ron Pair*] (because it was not an issue in the case) was whether, assuming there is an agreement underlying the claim, the court should look to that agreement to decide on the rate of interest to be allowed an oversecured creditor. *Giving full effect to the Supreme Court's interpretation of that comma leads ineluctably to the conclusion that the entire issue of interest is completely divorced from either the existence or the content of any underlying agreement.*

117 B.R. at 858–59. (emphasis supplied). After further analysis, Judge Clark concluded that the appropriate rate to be applied was the federal judgment rate, rather than either the contract rate or the default rate.

The creditor appealed and the Fifth Circuit reversed. *In re Laymon*, 958 F.2d at 72. The Fifth Circuit held, "There is nothing in the *Ron Pair* decision that leads us to believe that the Supreme Court intended to speak to the rate of interest under Section 506(b)." 958 F.2d at 74. Instead, the Fifth Circuit determined that Congress did not intend for Section 506(b) to change preexisting law. Finding that prior to the enactment of the Bankruptcy Code, the majority view was that the contract rate would apply in such circumstances, the Fifth Circuit concluded that the creditor was entitled to its contract rate of 10%. As to the default rate, again looking to pre-Code law, as surveyed in *In re W.S. Sheppley & Co.*, 62 B.R. 271 (Bankr.N.D.Iowa 1986), the court concluded that the availability of a post-maturity or default rate of interest should be determined "by examining the equities involved in the bankruptcy proceeding." 958 F.2d at 75.

Most of the lower court decisions on the subject come to a similar conclusion. The issue is thoroughly analyzed in an excellent opinion by Judge Brooks in *In re Hollstrom*, 133 B.R. 535 (Bankr.D.Colo.1991). In that case, the court *sua sponte* reviewed whether an oversecured creditor was entitled to a 36% default rate of interest. Anticipating the Fifth Circuit in *Laymon*, the *Hollstrom* court concluded, "Section 506(b) should be construed to include reference to interest at the contract rate," but held that the imposition of a default rate could conflict with equitable principles applicable in a bankruptcy proceeding, citing *Sheppley*. Noting that, as in this case, the *Hollstrom* "debtors are in bankruptcy; there are too many creditors chasing too few dollars," the court concluded that the interest rate was excessive and that it served as a penalty, not against the debtor, but against other creditors. The court therefore disallowed the claim for default interest

and restricted the creditor to its contract rate of interest. Other persuasive cases include *In re D.W.S. Invest., Inc.*, 121 B.R. 845 (Bankr.C.D.Cal.1990), *In re Consolidated Properties Ltd. Partnership*, 152 B.R. 452 (Bankr.D.Md.1993) and *Sheppley*.

The authority upon which the creditors primarily rely is *In re Skyler Ridge*, 80 B.R. 500 (Bankr.C.D.Cal.1987). In that case, the oversecured creditor sought interest at the default rate of 14.75% rather than the nondefault contractual rate of 10.75%. The court upheld the default rate, stating that: "this court finds no authorization in Section 506(b) to examine the reasonableness of the interest rate charged by the secured creditor. Section 506(b) contemplates the award of interest to an oversecured creditor at the contract rate, whatever that contract rate may be." 80 B.R. at 511. Notwithstanding this broadly worded language (again written pre-*Ron Pair*), however, the court's conclusion is clearly tempered by its determination that the default rate of interest sought was within a range of interest rates which it found to be acceptable. The court clearly intimated that if the default rate of interest were sufficiently high as to constitute a kind of "liquidated damages" the court could strike it down, notwithstanding the broad language apparently to the contrary in the decision. In short, even the *Skyler Ridge* court implicitly examined the reasonableness of the interest rate, and, finding it "well within the range of interest rates that the court has seen frequently in recent years," approved it.

Other cases approving default rates of interest contain similar hedges. For example, *In re Martindale*, 125 B.R. 32 (Bankr.D.Idaho 1991), while stating that the default interest terms are clearly set forth and agreed to in the contract documents and "the court has no license to disregard these provisions," 125 B.R. at 37, nevertheless found that the interest provisions were "otherwise reasonable." 125 B.R. at 36. Finally, *In re Courtland Estates Corp.*, 144 B.R. 5 (Bankr.D.Mass. 1992), involved a situation where no other creditors interest stood to be affected one way or the other by the decision on the appropriate interest rate. In that case, the debtor had paid all pre-petition unsecured creditors without court authority, leaving the debtor and the secured creditor as the only parties in interest. The debtor, having negotiated the default rate of interest, now sought to have it nullified, for its own benefit, not for the benefit of its creditors. In that circumstance, the court approved the default rate of interest, finding that any other result "would merely provide an undeserved windfall to the debtor." 144 B.R. at 9.

 Distilling this combination of Supreme Court, Ninth Circuit, and other authority to its essence, this Court is of the view that the claim of an oversecured creditor must include interest calculated at the contract rate and may include interest calculated at a post-maturity default rate, depending upon the equities of the case. In this case, the Debtor has no equity in the remaining funds from the disposition of its property. The parties at risk are creditors junior to the claim of the first lienholder, Mr. Foss. No serious attempt has been made by Foss to justify the default interest rate of 26% as anything other than a contractual sledgehammer against the Debtor. Indeed, to the extent this loan constituted a greater risk to Mr. Foss than other investments available at the time, that risk has been amply compensated by an 18% interest rate which, in April of 1992, was far above the market for fully secured first mortgage loans on apartment houses in the greater Phoenix area. The additional 8% comes directly out of the hide of junior creditors, not from the Debtor, and allowing it to be paid would be contrary to the policy of "ratable distribution of assets among the bankrupts' creditors," as enunciated by the Supreme Court nearly 50 years ago in *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). Therefore, the Court will limit interest on Foss' claim to 18%.

 The result is even clearer in connection with the Commerce Bank claim. That note carries a floating rate with a minimum interest of 9.5%. The default rate is 24%, nearly three times the contract rate. No attempt has been made by the creditor, and the Court doubts that any serious attempt could be made, to justify a rate increase of this magnitude on any market factors, risk

factors, or collection factors. Therefore, the Court will allow interest at the minimum rate of 9.5%.

## ATTORNEYS' FEES AND COSTS

Each creditor has also sought its attorneys' fees and costs. There requests are reviewed here separately.

 Foss seeks attorneys' fees in the amount of $6,631.25. In support thereof, Foss' counsel has submitted an Affidavit and Statement of Attorneys' Fees, including a detailed breakdown on a daily basis of time incurred and tasks performed. The Court has reviewed the requested fees, finds them reasonable and allows them. In addition, Foss seeks "bankruptcy costs" of $3,060.00, including $60.00 for a filing fee and a $3,000.00 appraisal. Given the creditor-oriented nature of this loan arrangement, it is surprising that the documents are devoid of a clear entitlement to costs, such as the appraisal or even the filing fee, incurred in connection with a bankruptcy case. The note itself refers only to "such sums as the court may fix as attorneys' fees," without reference to costs. The deed of trust provides for payment of fees and costs "of this trust," referring to foreclosure, reinstatement, and trustee's fees, but does not expressly authorize payment of the beneficiary's fees and costs. The deed of trust does provide that in the event that the trustor, here the Debtor, shall fail to make any payment or do any other act required, the beneficiary, Foss, "may make or do the same in such manner and to the same extent as either may deem necessary to protect the security hereof," and in connection with the exercise of *"such powers"* may recover expenses and reasonable fees. It is the Court's view that such language does not include payment for an appraisal, the purpose of which is not clearly set forth in the Application. Therefore, since the requested costs are not "provided for under the agreement" as required by Section 506(b), that request is denied.

 Foss also seeks "late penalty payments" of $22,567.50. These fees are subject to a "reasonableness" inquiry under Section 506(b). Given the over-market interest rate charged, and in light of the clearly overse-

cured position of Foss, fees of this magnitude (15% of each missed payment) are not reasonable when related to either any cost of collection or additional risk incurred by Foss. Therefore, they will be disallowed. All other fees requested by Foss, including foreclosure costs, trustee's fees and attorneys' fees incurred in connection with the foreclosure, will be allowed.

 Commerce Bank does not seek any foreclosure related expenses or late fees. It does seek attorneys' fees and costs of $5,148.29. In support of this award, Commerce Bank has submitted an Affidavit and Statement of Bankruptcy Attorneys' Fees, including fees of local Arizona counsel and primary California counsel. The Court has reviewed the detailed statements attached to the application and finds that, under the circumstances, and given the nature of this case, the amounts sought are reasonable. Therefore, Commerce Bank will be awarded fees and costs of $5,148.29. Unlike the Foss note and deed of trust, there is no question that the note and deed of trust clearly cover the costs and expenses and fees that are sought.

## CONCLUSION

The status of Mr. Shapiro's claim was not addressed by the Court at the hearing nor is it resolved by this Order. If any party has an objection to the allowance of Mr. Shapiro as a lienholder junior to Commerce Bank, such objection should be filed promptly and brought to the Court for resolution, if not resolved by the parties themselves. Counsel for Foss is directed to prepare a form of Order consistent with the terms of this opinion and to circulate it for review and approval to counsel for Commerce Bank, Mr. Shapiro, and the Unsecured Creditors' Committee. Should the parties be unable to agree on a form of Order, the Court will set a hearing promptly upon notification.