In re Glenn S. DIXON, Debtor,

**Florida Asset Financing Corporation, Appellant,**

v.

**Glenn S. Dixon, et al., Appellees.**

No. Civ.A. 98–0123–A.

United States District Court, W.D. Virginia, Abingdon Division.

Dec. 9, 1998.

Curtis Gilbert Manchester, Hazel & Thomas, P.C., Richmond, VA, for appellant.

Archibald Carter Magee, Jr., Magee, Foster, Goldstein & Sayers, Roanoke, VA, for appellees.

## OPINION

JONES, District Judge.

The questions in this bankruptcy appeal are (1) whether contractual default interest at the rate of thirty-six percent is available to an oversecured creditor as part of its claim against a debtor and (2) whether the bankruptcy court correctly determined the creditor's request for attorneys' fees. Finding that the facts of the case support the creditor's statutory right to default interest, I first hold that the bankruptcy court's decision to deny such interest was in error and reverse.

Second, I find that under the circumstances, the bankruptcy court's reduced award of attorneys' fees must be remanded for reconsideration.

## I.  Background.

Glenn S. Dixon, the debtor in this case, filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the bankruptcy court on April 30, 1997. As of that date, the principal amount and accrued interest owed by Dixon to Florida Asset Financing Corporation ("Florida Asset"), an oversecured creditor, was $161,919.19, exclusive of legal fees and other recoverable costs.

Florida Asset filed its original proof of claim in this case on October 17, 1997, setting forth the principal amount due on the loan, late fees of five percent accrued up to the time of default, interest running at eighteen percent through default, and past due interest running at thirty-six percent thereafter. An itemized accounting of the loan balance and interest claimed was attached thereto as an exhibit. The original proof of claim did not include attorneys' fees.

Dixon filed an objection to the proof of claim on October 22, 1997, stating therein that the thirty-six percent interest rate was punitive in nature and, therefore, barred under the Bankruptcy Code. In December 1997, Dixon amended his objection to the proof of claim to note that Florida Asset was required to move the court for allowance of interest, attorneys' fees, and costs. Shortly thereafter, on January 21, 1998, Florida Asset filed its motion for payment of interest, fees, and costs. Default interest was included in the motion but post-default late charges were not.

Also in January 1998, Florida Asset voluntarily transferred Dixon's stock interests in Dixon Lumber Company ("Dixon Lumber") back to Dixon in exchange for an escrow of amounts thought to be sufficient to pay Florida Asset in full for its claim, pending a hearing on the objections to its claim. Subsequently, Florida Asset filed an amended proof of claim on February 17, 1998, which set the remaining value of the secured claim at $57,864.77, including interest due as of March 3, 1998. The filed proof of claim

expressly did not include attorneys' fees accruing after December 15, 1997.

Dixon's objection to Florida Asset's claim was then heard before the bankruptcy court on March 3, 1998. Dixon presented evidence as to why the default rate provided under the terms of the note was a penalty and thus should not apply. Dixon did admit, however, that the amounts held in escrow to pay Florida Asset's claims were not necessary to pay off all of his creditors.

The court then considered the reasonableness of the attorneys' fees request. To rebut Florida Asset's reasonableness showing, Dixon offered the testimony of Howard J. Beck, Jr., Esquire, an attorney representing another secured creditor before the bankruptcy court that day. Florida Asset did not object to the use of Beck as a witness for the debtor and its objections to his testimony on relevance grounds were overruled. Although admitting that he had not read the fee application in detail, Beck stated that the fee request appeared "high." (Hearing Tr., March 3, 1998, at 36, 39.) Dixon offered no testimony or objections to the fee request other than to state that the overall time expended was unreasonable. On its behalf, Florida Asset stood behind its motion and did not provide further testimony at trial.

On June 19, 1998, the bankruptcy court presented its findings by memorandum opinion. *Dixon v. Florida Asset Financing Corp. (In re Dixon)*, 222 B.R. 98 (Bankr. W.D.Va.1998). First, the court held that the default interest rate of thirty-six percent was not interest in fact but "more in the nature of a penalty and punitive." *Id.* at 100. Furthermore, Florida Asset had not introduced evidence to support the particular default rate nor otherwise "shown it to be commercially reasonable in the industry." *Id.* Consequently, the court found the interest rate "excessive" and reduced Florida Asset's claim to the pre-default rate of eighteen percent. *Id.*

Second, the court reduced Florida Asset's fee request by approximately seventy-five percent, to $7,500, and its expenses request by approximately fifty percent, to $896.86. The requested foreclosure costs of $925 were

allowed. The court denied, however, Florida Asset's request for leave to file a supplemental request for attorneys' fees related to the hearing on Dixon's objections and post-trial briefs.

Florida Asset thereafter filed its notice of appeal. The parties have submitted briefs on the issues, oral argument was heard, and the appeal is now ripe for decision.

## II. Facts.

Dixon Development Group, Inc. ("DDG"), a corporation owned by Dixon and the parent corporation of Dixon Lumber, executed a promissory note dated March 5, 1996, and payable to Florida Asset in the principal amount of $150,000. The terms of the note provided for interest at eighteen percent per annum and late charges for delinquent monthly payments (not paid within ten days of the due date), computed at five percent of the monthly sum. Upon default, a default term of interest would apply under the terms of the note, computed at thirty-six percent per annum, or double the pre-default rate. The default rate applied to any principal, interest and other sum still payable under the note. DDG did not waive presentment, notice of dishonor, notice of demand, protest, or notice of nonpayment.

As inducement to Florida Asset to make the loan, Dixon guaranteed the obligations of DDG under the note pursuant to a guaranty agreement dated March 7, 1996. Therein, Dixon guaranteed timely payment of the principal, interest, and premium under the note.

Also in connection with the loan, Dixon and DDG executed two security agreements on March 7, 1996. Florida Asset was thereby granted security interests in certain real property, shares of stock of Dixon Lumber, and DDG's inventory, accounts, and equipment, amongst other things, which, in total, rendered Florida Asset's claim in this case oversecured. The record indicates that Florida Asset's loan to DDG was secured by collateral worth, in Dixon's own estimation,

"approximately one million dollars." (Tr. at 19.) It is uncontested, however, that the interest, when added to the principal amount of the loan, was less than the value of the collateral. (Br. of Appellant at 6.)

On January 11, 1997, Dixon allowed DDG to default under the terms of the note. Florida Asset subsequently began foreclosure proceedings on the real property securing its loan to Dixon. Florida Asset also requested that Dixon Lumber transfer Dixon's stock interest in the company to Florida Asset. Upon the advice of counsel, Dixon Lumber transferred the stock to Florida Asset on April 29, 1997.[1]

On April 30, 1997, Dixon filed for Chapter 11 protection. Dixon then asserted an adversary proceeding against Florida Asset to enjoin the stock transfer, apparently not knowing that the transfer had been completed. The parties ultimately agreed to a consent injunction, whereby Florida Asset agreed not to sell the stock in order to allow Dixon time to satisfy Florida Asset's claims through the liquidation of certain real property in his estate also serving as collateral for the loan. In fulfilling his obligation to Florida Asset, Dixon initially attempted to harvest the land in question for timber, then surveyed the two large tracts for subdivisions, and finally received upset bids in lieu of auction. In all, this process took an estimated six months' time. Dixon also borrowed money on a secured basis from Dixon Lumber to this end. (Br. of Appellant at 4.)

Dixon subsequently paid Florida Asset prior to the hearing below a sum totaling $161,-919.19, which represented the entire amount of the principal and the pre-default interest. Other monies under the terms of the note, however, were still due, including default interest, post-default late charges, and attorneys' fees.

As of the date of this appeal, Dixon had paid $167,538.82 to Florida Asset. (Br. of Appellant at 22.) To the court's knowledge,

---

1. There is some dispute as to how the debtor's stock transfer from Dixon Lumber was effectuated in this case. It is Florida Asset's contention that Dixon granted his power of attorney to transfer his stocks solely to the secretary of Dixon Lumber's parent corporation, DDG, and not to Florida Asset as alleged. (Reply Br. of Appellant at 1.)

no plan of reorganization has been filed in this case.

Florida Asset now seeks default interest under the note and reimbursement for attorneys' fees totaling approximately $35,000. The original fee request of $30,422 is included in that amount, and the remaining balance consists of Florida Asset's supplemental request for fees from December 16, 1997, to February 27, 1998. (Br. of Appellant at 22, n. 11.) The amount requested for reimbursement of expenses for Florida Asset's counsel totals $1,793.72.

### III.  Analysis.

#### A.  Standard of Review.

█ Under the applicable standards of review, the bankruptcy court's findings of fact are reviewed for clear error. Fed. R.Bankr.P. 8013. The bankruptcy court's conclusions of law, on the other hand, are reviewed de novo. *See Woodbridge Place Apts. v. Washington Square Capital, Inc.,* 965 F.2d 1429, 1435 (7th Cir.1992).

#### B.  Recovery of Interest Under Bankruptcy Code § 506(b).

The Bankruptcy Code provides that, in general, a claim must be oversecured in order for a party to recover postpetition interest in addition to reasonable fees, costs, and charges, as part of its secured claim. *See* 11 U.S.C.A. § 506(b) (West 1993 & Supp.1998). An oversecured claim exists where the value of the collateral at issue exceeds the amount of the claim after taking into account any amounts chargeable to the collateral under section 506(c) of the code. *See id.; see also 4 Collier on Bankruptcy* ¶ 506.04 at 506–104 (Aug.1997). The relevant code section reads, in pertinent part, as follows:

> (b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges pro-

vided for under the agreement under which such claim arose.

11 U.S.C.A. § 506(b).

As to the appropriate rate of interest applicable to an oversecured creditor's principal claim, however, section 506(b) and the accompanying legislative history are unfortunately silent. The courts have been left to determine whether oversecured creditors are entitled to the benefit of their bargain when debtors default, and in particular, whether postpetition interest in the form of default interest may be claimed pursuant to bargained for contractual terms. The Supreme Court has not addressed the rate of interest issue under section 506(b), nor has a consensus developed among the courts of appeal as to the treatment of default interest and the circumstances under which recovery is appropriate.[2]

The Court did look at the language of section 506(b) in *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). The Court held that the phrase "interest on such claim" stood alone and did not modify the phrase "provided for under the agreement under which such claim arose." *Id.* at 241, 109 S.Ct. 1026. By opining that "[r]ecovery of postpetition interest is unqualified" and not reliant on a consensual agreement, whereas recovery of fees, costs, and charges is qualified by the two-fold requirement that they be provided for in an agreement and meet a reasonableness test, the Court interpreted the statute to yield two distinct types of recovery. *Id.* at 241–42, 109 S.Ct. 1026.

The *Ron Pair* holding was limited, however, to the issue of *entitlement* to postpetition interest-the Court did not decide what the appropriate *rate* of interest should be under section 506(b). *See id.* at 243–46, 109 S.Ct. 1026; *see also Bradford v. Crozier (In re Laymon),* 958 F.2d 72, 74 (5th Cir.1992) (holding that "[t]here is nothing in the *Ron Pair* decision that leads us to believe that the Supreme Court intended to speak to the rate

---

**2.** *See generally* Deborah A. Crabbe, *Should an Over–Secured Creditor Be Entitled to Post–Petition* *Interest at the Default Rate?,* Am.Bankr.Inst.J., March 1998, at 8.

of interest under § 506(b)").[3] The great majority of courts to have considered the issue of entitlement to postpetition interest since *Ron Pair* have concluded that the contract rate of interest applies. 4 Collier on Bankruptcy ¶ 506.04[2][b][I] at 506–113. This reliance on the contract rate does not derive from *Ron Pair* itself,[4] but instead "is consistent both with cases decided before *Ron Pair* as well as pre-Code case law."[5] *Id.*

Default rates of interest do not enjoy, however, the same straightforward treatment that postpetition interest claims for basic interest do generally. As such, default interest rates are characterized as "supplemental interest charges," included in the financial contract in addition to the specified, basic interest rate. 4 Collier on Bankruptcy ¶ 506.04[2][b][ii], at 506–114. Default rates are also necessarily higher than basic interest rates in order to compensate creditors for the both the predictable and unpredictable costs of monitoring the value of collateral in default situations. *See In re Terry Ltd. Partnership*, 27 F.3d 241, 244 (7th Cir.1994); *In re Consolidated Properties Ltd. Partnership*, 152 B.R. 452, 457 (Bankr.D.Md.1993). Just how high a default rate may be set under the Code has been interpreted by the Supreme Court, which noted in *Rake v. Wade*, 508 U.S. 464, 471, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993), that postpetition interest may be claimed up to the extent of the value of the collateral.

Entitlement to default interest is generally determined either by a reliance on equitable principles or the cure rationale evoked by the Ninth Circuit in *Great Western Bank & Trust v. Entz–White Lumber & Supply, Inc. (In re Entz–White Lumber & Supply, Inc.,)* 850 F.2d 1338, 1340–42 (9th Cir.1988).[6] Contrary to comments made in dicta by the court below, however, Dixon had not "essentially ... cured" his default in this case. *In re Dixon*, 222 B.R. at 101. Notwithstanding the issue of default interest, the resolution of which would undeniably have impacted the bankruptcy court's assessment of cure in this case, Dixon still owed late charges accruing from the time of default. Having credited Dixon with payment of pre-default late charges, as provided under the contract, I can only assume that the bankruptcy court overlooked Florida Asset's right to recover the remaining arrearage of post-default late charges. Regardless, it is clear that the debtor's default had not been cured.

Consequently, I now turn to an analysis of equitable principles to resolve the issue of Florida Asset's entitlement to default interest.

The majority of jurisdictions allow, or at least give "a presumption to the allowability of, default rates of interest, provided that the rate is not unenforceable under applicable nonbankruptcy law." 4 Collier on Bankrupt-

3. Since *Ron Pair,* the Court has also provided support for the proposition that § 506(b) allows interest on interest, regardless of underlying state law. *See Rake v. Wade,* 508 U.S. 464, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993); *see also* 4 Collier on Bankruptcy ¶ 506.04[2][a] at 506–111 to 506–112 n. 28 (June 1998). Once again, however, the Court's holding in *Rake* did not speak to the appropriate rate to be applied or its source.

4. In noting that *Ron Pair* does not compel this result, I do not read the Court's unqualified provision of postpetition interest under § 506(b), as some courts have done, to confer either outright acceptance or rejection of the contractual terms. *See, e.g., In re Skyler Ridge,* 80 B.R. 500, 511 (Bankr.C.D.Cal.1987) (accepting the contractual default interest rate and disavowing a reasonableness inquiry); *contra In re Consolidated Properties Ltd. Partnership,* 152 B.R. 452, 457 (Bankr.D.Md.1993); *In re Laymon,* 117 B.R. 856, 858 (Bankr.W.D.Tex.1990), *rev'd sub nom. Bradford v. Crozier,* 958 F.2d 72 (5th Cir.1992) (reject-

ing the contractual default interest rate for a reasonableness analysis).

5. Under pre-Code law, the majority of courts utilized the contract rate of interest in allowing an oversecured creditor postpetition interest, provided such rate did not produce an inequitable or unconscionable result. *See In re Laymon,* 958 F.2d at 74.

6. *See* Crabbe, *supra* note 2, at 9, 22. In *In re Entz–White Lumber & Supply, Inc.* the court held that a debtor who cured his debt by paying the arrearage on a secured creditor's obligation had cured the default and was entitled to avoid all consequences of default, including payment of default interest. 850 F.2d at 1340. Under the Ninth Circuit's reasoning, therefore, cure may be constituted, and a claim for default interest defeated, where a debtor's plan of reorganization provides that the debtor will pay the arrearage on a debt or pay a matured obligation in full. *Id.* at 1341–42.

cy ¶ 506.04[2][b][ii] at 506–114. The constraints imposed by nonbankruptcy law are a reference to the equitable powers of the bankruptcy courts. *See Vanston Bondholders Protective Comm. v. Green,* 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946). In this vein, the Supreme Court has noted that "the touchstone of each decision on allowance of interest in bankruptcy ... has been a balance of equities between creditor and creditor or between creditors and the debtor." *Id.* at 165, 67 S.Ct. 237.

The facts and equities specific to each case thus prove determinative in the analysis of default rates. *See In re Terry Ltd. Partnership,* 27 F.3d at 243. Within this analysis, the contract default rate is neither irrelevant nor predictive. *Id.* Still, "[n]o court which directly addresses the issue appears willing to rule out the possibility that certain circumstances might necessitate an equitable deviation from the stated contractual default rate of interest." *In re Hollstrom,* 133 B.R. 535, 539 (Bankr.D.Colo.1991). The Seventh Circuit has noted that "[w]hat emerges from the post-*Ron Pair* decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations." *In re Terry Ltd. Partnership,* 27 F.3d at 243. The Fifth Circuit has adopted a comparable standard, holding that the determination of whether to apply the default rate, rather than the pre-default rate, would be ultimately decided by looking beyond the contract to examine the equities involved. *See In re Laymon,* 958 F.2d at 74.

The question presented by this case is just how far the bankruptcy court's equitable powers extend under a modern reading of section 506(b).

Unfortunately, "there is no clear, emerging, definite enumeration of [the] special circumstances or equitable considerations" which mandate an equitable deviation from the contractual default interest rate. *In re Hollstrom,* 133 B.R. at 539. The holding in *Ron Pair* does, however, prove useful to this analysis. Therein, the Court noted that the congressional reformulation of the Code (to include section 506(b) among other provisions) "was intended to modernize the bankruptcy laws." 489 U.S. at 240, 109 S.Ct. 1026. More specifically, the legislative intent behind the unqualified entitlement to postpetition interest in section 506(b) was to "codif[y] creditors' rights more clearly than the case law ... [b]y defin[ing] the protections to which a secured creditor is entitled, and the means through which the court may grant that protection." *Id.* at 248, 109 S.Ct. 1026 (quoting H.R.Rep. No. 95–595, at 4–5 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5965–66).

The reach of the bankruptcy court's equitable powers is consequently circumscribed by the legislature's intent to clarify creditors' rights through codification. *See Ron Pair,* 489 U.S. at 248, 109 S.Ct. 1026.[7] Clearly, no exercise of the bankruptcy court's equitable powers may infringe on the plain meaning of the Bankruptcy Code. As the Eleventh Circuit has noted in its interpretation of section 506(b), "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Equitable Life Assurance Society v. Sublett (In re Sublett),* 895 F.2d 1381, 1385–86 (11th Cir.1990) (quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988)). Therefore, "[a]lthough an award of post-petition interest is governed generally by the equities of the case, the Bankruptcy Code provides oversecured creditors with certain statutory rights to interest." *Id.* at 1386 (quoting *Bank of Honolulu v. Anderson (In re Anderson),* 833 F.2d 834, 836 (9th Cir.1987)). "[T]o the extent that

---

7. In the absence of congressional efforts to clarify oversecured creditor's rights to postpetition interest under § 506(b), I am guided by the Court's literal interpretation of the Code's § 506(b) provisions in *Ron Pair* and the express legislative intent with regard to the Code as a whole.

To rectify the situation is, as one commentator recently put it, a call to amend the Code: "Con-

gress can either amend [section 506(b) ] to conform with its original intent to expand secured creditors' rights under the bankruptcy Code; or Congress can remain true to bankruptcy's equity principles and place restrictions on secured creditors' rights to interest." *Crabbe, supra* note 2, at 22.

*Vanston's* equitable analysis suggests a result contrary to the language of the present Bankruptcy Code, *Vanston* has been superseded." *Id.* Thus, within the exercise of their equitable powers, it is clear that the bankruptcy courts may not act so as to burden the statutory rights of oversecured creditors. *See In re Lapiana*, 909 F.2d 221, 224 (7th Cir.1990) (noting that "bankruptcy judges are not empowered to dissolve rights in the name of equity").

■ Some courts have also required creditors to provide some affirmative justification for the contractual default interest rate, either through demonstrated need or prevailing industry practice. *See In re Terry Ltd. Partnership*, 27 F.3d at 245. Such a requirement cannot, however, be deemed a per se rule.[8] As the court below noted, analysis of default interest rates is based on the facts and circumstances of each case. *See In re Dixon*, 222 B.R. at 100 (citing *Ron Pair*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290, for that general proposition). In fact, the only legal parameters for interest terms generally are set by state law and policy. *See In re Hollstrom*, 133 B.R. at 538–39. Then, upon filing for bankruptcy, federal law applies, and an oversecured creditor's default rate is only limited by the value of the collateral secured. *See Rake*, 508 U.S. at 471, 113 S.Ct. 2187.

■ Consequently, the rule governing my consideration of this case is as follows: where the circumstances necessitating an equitable deviation are plainly absent and the contract interest rate does not violate state usury laws, function as a penalty, or exceed the value of the collateral, the presumption in favor of the contract rate has not been rebutted. To do otherwise is to impinge on a creditor's statutory rights under section 506(b). My conclusion here is supported by the Second Circuit, which reached the same conclusion on a case involving similar facts:

> In the bankruptcy context, where the debtor is solvent and, therefore, the unsecured creditors would not be harmed by the imposition of a higher interest rate and the contest over default interest involves only a creditor and a stockholder/debtor, payment of the default rate of interest may be proper.

*Ruskin v. Griffiths*, 269 F.2d 827, 831–32 (2d Cir.1959) (cited in *In re Hollstrom*, 133 B.R. at 538 n. 7).

In this case, the presumption is, therefore, in favor of the contract default rate. In order to discover what equitable considerations may support the bankruptcy court's decision to deviate from this contract rate, I now turn to an analysis of the case law.

The courts which have considered this issue have continued to cite the need to balance the equities between creditor and creditor or creditor and debtor. *In re Hollstrom*, 133 B.R. at 540 n. 13 (citing *Vanston*, 329 U.S. at 165, 67 S.Ct. 237). Within this calculus, the first concern is that of "equitably adjusting contending creditors' claims and rights, and effectuating a fair distribution of a debtor's property among those creditors." *Id.* at 541. In light of Congress' enactment of section 506(b) and the statutory right it creates to postpetition interest, it is not entirely clear what role other creditors' rights play in a judicial determination of the interest rate.[9] Nonetheless, numerous courts

---

**8.** As the bankruptcy court noted in *In re Hollstrom*, 133 B.R. at 541, the chief components of a court's analysis in reaching a conclusion are the Code and applicable case law, the facts of the case, and the equitable principles of distribution among creditors in bankruptcy. A court's conclusion is only "reinforced" by the presence or absence of evidence submitted by the creditor that the default rate was "reasonable, market-based, within the 'range of acceptable commercial rates,' or based on actual loss." *Id.*

Furthermore, a per se rule which requires justification for the use of a particular default rate seems to go against the purpose behind the use of default rates in the first place. Default interest rates are used as a means of compensating a lender for the unpredictable and hard-to-quantify administrative expenses and inconvenience in monitoring untimely payments. *See In re Terry Ltd. Partnership*, 27 F.3d at 244. "The costs incurred in performing this task vary from case to case and simply cannot be provided for beforehand." *Id.*

**9.** In fact, the Court in *Ron Pair* noted that, "[al]though the payment of postpetition interest is arguably somewhat in tension with the desirability of paying all creditors as uniformly as practicable, Congress expressly chose to create that alleged tension. There is no reason to suspect that Congress did not mean what the language of

have conducted an analysis of the equities and chosen to attach significance to the existence of other claims in addition to that of the oversecured creditor. *See, e.g., In re Maywood, Inc.,* 210 B.R. 91, 93 (Bankr. N.D.Tex.1997) (precluding default interest on the equities of the case and noting that it was "unclear whether the unsecured creditors ... [would] receive any distribution whatsoever"); *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 458 (precluding default interest on the equities and noting that collection of the default interest rate and late charges would be "at the expense of junior creditors"); *In re Hollstrom,* 133 B.R. at 541 (holding that a court is to be guided by the Code, applicable case law, the facts of the case, and "the equitable principles of distribution among creditors in bankruptcy").

Second, as noted above, the courts must balance the equities between the oversecured creditor and debtor. As the court noted in *In re Hollstrom,* "[s]ight must never be lost of the fact that these Debtors are in bankruptcy; there are too many creditors chasing too few dollars." 133 B.R. at 540. After a debtor files for bankruptcy, a creditor's rights are generally "more restricted because of the codified public policy of giving a debtor an opportunity to attempt to reorganize." *Id.* (quoting *In re Wonder Corp. of America,* 72 B.R. 580, 588 (Bankr.D.Conn.1987)).

■ Closely connected to each of the above is the equitable concern that a default rate may function as "a coercive penalty rather than a bargained for attempt to compensate a creditor for its extra costs after a default." *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 455; *see In re DWS Investments, Inc.,* 121 B.R. 845, 849 (Bankr. C.D.Cal.1990). Where the creditor admittedly includes the default rate in order to coerce performance by the debtor, rather than as a means of compensating the non-breaching party, the default rate will be deemed a penalty.[10] *See In re Timberline Property Development, Inc.,* 136 B.R. 382 (Bankr. D.N.J.1992).

If the rate is a penalty, "it would be inequitable to allow its impact to fall on other creditors or to allow it to destroy a debtor's opportunity to reorganize." *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 455–56. Consequently, a court does not err in calling a default interest rate a penalty where it is unconscionable, *see Presque Isle Apartments, L.P. v. Fidelity Union Bank/ First National Bank (In re Presque Isle Apartments, L.P.),* 109 B.R. 687, 689 (Bankr. W.D.Pa.1990) (holding that to allow a creditor "interest at the criminal usury rate would clearly be unconscionable and unenforceable as a penalty"), or deprives other creditors of their claims. As one bankruptcy court stated:

> It is reasonable to conclude that an excessive default interest rate imposed by a secured creditor serves as a penalty, or hammer ... as against other creditors, not the debtor, and specifically against unsecured creditors. This is particularly true in a bankruptcy situation where the unsecured creditors are already probably taking a substantial hit on their claims.

*In re Hollstrom,* 133 B.R. at 541.

In the presence of some or all of these equitable circumstances, the majority of courts have gone one step further and required some affirmative showing of reasonableness by the creditor in order to recover postpetition interest at the default rate. *See, e.g., In re Terry Ltd. Partnership,* 27 F.3d at 243–44; *In re Consolidated Properties Ltd. Partnership,* 152 B.R. at 457; *In re Hollstrom,* 133 B.R. at 539–40; *In re DWS Investments, Inc.,* 121 B.R. at 850. Where the default rate of interest cannot then be justi-

the statute says." 489 U.S. at 245–46, 109 S.Ct. 1026.

**10.** The court in *In re Consolidated Properties Ltd. Partnership* held that default rates were more in the nature of additional "fees, costs, or charges provided for under the agreement," than interest under the language of 11 U.S.C.A. § 506(b), and thus subject to the express reasonableness limitation of the Code section. 152 B.R. at 455. The

court cites no authority for this conclusion and I expressly decline to follow it here.

The facts of this case show a contract with clearly defined provisions and discrete, differentiated terms. Under the plain reading of § 506(b) then, and in accordance with *Ron Pair,* postpetition interest is unqualified, while the agreed to fees, costs, and charges are subjected to a reasonableness limitation.

fied by the creditor, either by showing a "demonstrated need or by prevailing industry practice," *In re Terry Ltd. Partnership,* 27 F.3d at 244, the courts have deferred to the non-default, contract interest rate. *See, e.g., In re Hollstrom,* 133 B.R. at 541 (holding that a creditor's failure to submit any evidence that a thirty-six percent default rate was "reasonable, market-based, within the 'range of acceptable commercial rates,' or based on actual loss" *reinforced* the court's decision to disallow the rate and award the non-default rate of twelve percent) (emphasis added).

■ Upon review, however, I find that those cases presenting equitable circumstances necessitating a deviation from the contract default rate are distinguishable on their facts. In this case, the contract default rate of interest in question violates neither state nor federal law, and there is a notable lack of circumstances which would encourage an equitable deviation from the stated contractual default rate.

First, the parties have stipulated to the fact that the default interest rate is not usurious under applicable state law. Virginia law provides that the defense of usury is not available to avoid or defeat the payment of interest on business loans of $5,000 or more. *See* Va.Code Ann. § 6.1–330.75 (Michie 1993). In this case, Dixon guaranteed a commercial loan of $150,000 and thus may not raise a defense of usury under Virginia law.

Second, there is also no dispute that in accordance with the limits of section 506(b), the interest sought by Florida Asset, when added to the principal amount of its claim, does not exceed the value of the collateral securing its claim.

Third and finally, other equitable circumstances necessary to allow a court to deviate from the contract default rate do not exist. Both parties agree that there are no junior creditors, secured or unsecured, who will be prejudiced by an award of the default term. In fact, Dixon has the money necessary to settle the dispute set aside in escrow pending the result of this litigation, and those funds are not needed to satisfy other creditors.

Furthermore, at no time has it been indicated that satisfaction of the claim pursuant to the default rate would unduly burden Dixon's financial state of affairs or reorganization efforts. In fact, as of the date of hearing in this court, no plan of reorganization had been filed by the debtor.

■ It seems clear as well that the bankruptcy court erred when it deemed the default rate to be a penalty. No evidence exists on the record to support the bankruptcy court's characterization. The default rate is, once again, within the bounds of state usury law, and merely calling the rate "exorbitant," *In re Dixon,* 222 B.R. at 100, or noting its large departure from the non-default rate does not suffice to render it unconscionable. Nor may a default rate be seen to function as a penalty against other creditors where, as is the case here, none will be damaged by awarding the claim. Similarly, there is no evidence to indicate that Florida Asset intended the higher default rate as a means of coercing payment. Under the facts and circumstances of this case, Florida Asset's representation that the default rate was proportionate to the reasonably anticipated damage from default and thus not a penalty is sufficient.

In sum, the contractual default interest rate in this case has not been rebutted by equitable considerations. The bankruptcy court's decision below to reject the default interest rate and apply the non-default interest rate was, therefore, erroneous. The Code and applicable case law, facts of the case, and equitable principles of distribution compel that Dixon should be held to the contract default rate of interest provided in the note. To find otherwise here would render a windfall to the debtor.

In turn, I find that the bankruptcy court below erred by resting part of its holding on Florida Asset's failure to justify the reasonableness of the default rate. An affirmative showing of reasonableness would only reinforce the clear conclusion in this case, while unnecessarily burdening the statutory rights of Florida Asset as an oversecured creditor under section 506(b).[11] Consequently, I find

---

11. I briefly note here that were this a case re-

quiring such a showing, Florida Asset could as-

that the bankruptcy court's reliance on Florida Asset's failure to introduce evidence in support of the default rate, through a showing of demonstrated need, commercial reasonableness, or otherwise, was erroneous.

While a thirty-six percent interest rate is high, the courts do not have plenary power to alter commercial contracts or to substitute their judgment for that of the parties. This was a lawful business transaction between sophisticated parties. Despite the generous default interest rate, there are no third parties hurt by recognition of the contract term, and no evidence exists that Dixon will be thwarted in his efforts to reorganize. To relieve Dixon from his contractual obligation, therefore, would be unjustified.

### C. Recovery of Reasonable Fees, Costs and Charges Under Bankruptcy Code § 506(b).

The language of 11 U.S.C.A. § 506(b) provides that an oversecured creditor may recover as part of its claim those fees, costs, and charges included in the agreement that are deemed "reasonable." 11 U.S.C.A. § 506(b).

#### 1. Late Charges.

The reasonableness of charges under section 506(b) is determined by reference to the relevant state contract law. *See Mack Financial Corp. v. Ireson*, 789 F.2d 1083, 1084 (4th Cir.1986). The Fourth Circuit has upheld the allowance of late charges of five percent of unpaid installments in such a case. *See id.* The courts have also allowed late charges of five percent of the remaining principal balance unpaid after maturity. *See In re Consolidated Properties Ltd. Partnership*, 152 B.R. 452, 458 (Bankr.D.Md.1993).

Even where the late charge is reasonable, however, a creditor may be denied recovery on that basis where it also asserts a claim to a default rate of interest. *See id.; see also In re 1095 Commonwealth Ave.*

*Corp.*, 204 B.R. 284, 304–05 (Bankr.D.Mass. 1997) (allowing recovery at default rate of interest but precluding recovery of late fees because "[b]oth the late charge and the default rate of interest are intended to compensate the lender for the increased costs of administration caused by the borrower's failure to make the payment as and when it is due"). Thus, the case law is settled: "oversecured creditors may receive payment of either default interest or late charges, but not both." *In re Vest Assocs.*, 217 B.R. 696, 701 (Bankr.S.D.N.Y.1998).

Pursuant to the terms of the note in this case, a late charge of five percent of the monthly payment would become due if a monthly payment was made late. (Br. of Appellant at 2.) For purposes of contesting the bankruptcy court's characterization that Dixon had essentially "cured" his default, *In re Dixon*, 222 B.R. at 101, Florida Asset alleges that post-default late charges have not been paid by Dixon. Dixon does not contest Florida Asset's allegation.

Florida Asset also notes, however, that its proof of claim "did not seek 5% late payment charges in addition to the 36% past due interest rate for the period of default." (Br. of Appellant at 5.) Therefore, Florida Asset correctly seeks here the only recovery available under the circumstances; namely, a claim for default interest.

#### 2. Attorneys' Fees.

As the bankruptcy court below noted, Dixon concedes that Florida Asset is oversecured and, under the note and section 506(b), is thus entitled to reasonable attorneys' fees and expenses. The court applied the twelve-factor, "lodestar" analysis, first used in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), and adopted by the Fourth Circuit in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 (4th Cir.1978), to ascertain the reasonableness of the fees requested. Under the analy-

---

sert the conditions necessary to justify its inclusion of a default rate at thirty-six percent in the contract. As noted in its reply brief, "Florida Asset was not presented the opportunity to present evidence regarding its interruption in cash flow, extended loan servicing costs, additional

costs of telephone, telefaxes and other consequential costs of default." (Reply Br. of Appellant at 4.) Further justification for the particular chosen rate, however, is not dictated on the facts of this case.

sis, the bankruptcy court is to consider and make detailed findings with regard to the following twelve factors (the "*Johnson* factors") relevant to the determination of reasonable attorneys' fees:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Id.* at 226 n. 28 (citing *Johnson*, 488 F.2d at 717–19). The burden of proof to show any reasonable allowance of fees is upon the creditor moving for such an entitlement. *See In re Kenneth Leventhal & Co.*, 19 F.3d 1174, 1177 (7th Cir.1994); *In re Harman Supermarket, Inc.*, 44 B.R. 918, 920 (Bankr. W.D.Va.1984).

The allowance of attorneys' fees "is within the judicial discretion of the trial judge, who has close and intimate knowledge of the efforts expended and the value of the services rendered. And an appellate court is not warranted in overturning the trial court's judgment unless under all of the facts and circumstances it is clearly wrong." *Barber*, 577 F.2d at 226 (internal citations and quotation marks omitted). Appellate review is therefore limited in scope to an abuse of discretion standard. *Id.* An abuse of discretion finding by this court is warranted where the bankruptcy court either (1) failed to exercise its discretion; (2) failed to take relevant facts constraining its exercise of discretion into account; or (3) based its conclusions on erroneous conclusions of law or fact. *See James v. Jacobson*, 6 F.3d 233, 239 (4th Cir.1993).

Adequate examination and review by this court for abuse of discretion is not possible, however, where the bankruptcy court has not set forth its reasons for finding a particular award appropriate. *Barber*, 577 F.2d at 226. Although the bankruptcy court need not explicitly address all twelve factors in its reasonableness analysis, *see Alexander S. v. Boyd*, 113 F.3d 1373, 1391 (4th Cir.1997) (addressing the lodestar analysis in a civil rights case under 42 U.S.C.A. § 1988), any award of fees must be accompanied by "detailed findings of fact with regard to the factors considered." *Barber*, 577 F.2d at 226.

In light of my holding above, which entitles Florida Asset to default interest, it is necessary to remand the fees portion of the case to the bankruptcy court for reconsideration. The increased recovery available to Florida Asset alters the context for analyzing the reasonableness of Florida Asset's fee request. Undoubtedly then, a number of the *Johnson* factors are affected, and the court below must conduct its review of the fee request with this altered landscape in mind.

Since the bankruptcy court must reconsider the issue of attorneys' fees and expenses, I express no view of Florida Asset's objections to the prior fee award. Florida Asset may raise those issues with the bankruptcy court, together with its supplemental request for attorneys' fees.

## IV. Conclusion.

Based on the facts and circumstances of this case, I find that the bankruptcy court committed error by not allowing Florida Asset interest at the contract default rate. In so holding, I find that the facts before the court below did not reflect the existence of equitable circumstances which would justify a deviation from the otherwise legal, contract rate. Because the required equitable considerations were not present, I further find that the bankruptcy court below erred by calling for an affirmative showing of reasonableness on the part of Florida Asset in support of its contract default interest rate.

In light of this finding, I also remand the issue of attorneys' fees and expenses to the

bankruptcy court for reconsideration. Upon remand, the bankruptcy court should apply the twelve *Johnson* factors of the lodestar analysis to determine the reasonableness of the requested fees and expenses.

An appropriate judgment will be entered.