**In re 139–141 OWNERS CORP., Debtor.**

**No. 03–B–22868 (ASH).**

United States Bankruptcy Court,
S.D. New York.

Feb. 3, 2004.

Rattet, Pasternak & Gordon Oliver, LLP, By Jonathan S. Pasternak, Harrison, NY, for Debtor.

Backenroth, Frankel & Krinsky, LLP, By Mark A. Frankel, New York City, for Debtor.

Neubert, Pepe & Monteith, P.C., By Douglas S. Skalka, New Haven, CT, for Creditor, Development Strategies, Inc.

Robinowitz, Cohlan, Dubow & Doherty LLP, By Richard M. Cohlan, White Plains, NY, for Creditor, Golden Age Mortgage Corporation.

## DECISION ON OVERSECURED CREDITOR'S RIGHT TO DEFAULT INTEREST

ADLAI S. HARDIN, JR., Bankruptcy Judge.

The main issue in this contested matter is whether an oversecured creditor may be deprived of a contract right to a default rate of interest under 11 U.S.C. § 1124(2) for the sole benefit of the debtor, where the mortgaged property has been sold for an amount sufficient to pay all unsecured creditors in full with statutory interest. As a matter of law and on the facts in this case, the answer to this question is "no."

The first mortgagee is entitled to its contract right to default rate interest. The second mortgagee is not entitled to default rate interest under the terms of its note.

### Jurisdiction

This Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of reference to bankruptcy judges dated July 10, 1984 signed by acting Chief Judge Robert J. Ward. This is a core proceeding under 28 U.S.C. § 157(b).

### Background

The material facts are simple and not in dispute.

The debtor is a holding company, the sole assets of which are two adjoining mixed-use commercial properties located at 139–141 Main Street, Mount Kisco, New York, each building having both residential and commercial units for rent. These contiguous buildings are both subject to two mortgages, a $600,000 original principal amount first mortgage held by Development Strategies Company Profit Sharing Plan ("DSC") as assignee of Fourth Federal Savings Bank, and a $75,000 principal amount second mortgage held by Golden Age Mortgage Corp. ("GAMC").

In September 2002 the debtor defaulted under both mortgages and made no further payments under either mortgage, although the debtor tendered a check to GAMC on November 8, 2002 sufficient to cover the months of September, October and November which was rejected by GAMC.[1] GAMC sent a "NOTICE OF DEFAULT" dated October 28, 2002 to the debtor concluding that "the loan may now

---

1. There is a dispute between the debtor and GAMC as to whether the debtor had funds in its checking account sufficient to pay the check tendered on November 8, 2002. For the reasons set forth in point II of this Decision, the dispute is not relevant to the outcome and need not be resolved.

be accelerated and the Mortgage securing this loan foreclosed." DSC acquired the first mortgage from Fourth Federal Savings Bank on December 19, 2002. On December 20, 2002 DSC wrote to the debtor serving "formal notice that you are presently in default under the terms of your Note and Mortgage" and that "Your payment for the entire unpaid balance of the loan has been accelerated and due and payable immediately." However, at no time did either GAMC or DSC commence foreclosure proceedings. DSC and GAMC are affiliated by common ownership. The individual who filed affidavits on behalf of both DSC and GAMC, Thomas R. Borek, is an officer of both corporations.

One reason for the secured creditors' forbearance from commencing foreclosure proceedings undoubtedly was the fact that the debtor made clear its intention to sell one of the two mortgaged properties and pay off both mortgages in full. By letter dated December 30, 2002, an attorney for the debtor wrote to DSC advising that the debtor had an "accepted offer" for the 141 Main Street property for a purchase price of $875,000, far more than enough to pay off both first and second mortgages at the default rate of interest. Following a telephone conference, the debtor's attorney wrote to DSC on January 3, 2003 stating that "my client would like to bring her loan current by paying to you all principal and interest which is currently due and payable under the loan" and stating that the debtor "would like to make the same arrangement with respect to" the GAMC loan. However, the proposed sale for $875,000 fell through, and the debtor was not able to promptly contract for and consummate a sale thereafter. Moreover, it appears that in further discussions between the parties the secured creditors declined to waive their asserted rights to interest at the default rates provided under the respective mortgage notes. It was the secured creditors' refusal to waive their claim to default rate interest that precipitated the debtor's bankruptcy filing.

On May 20, 2003 the debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code. Two weeks later, by application dated June 6, 2003, the debtor sought authority to sell the portion of the mortgaged premises known as 141 Main Street, Mount Kisco, New York pursuant to Section 363(f) of the Bankruptcy Code. Both secured creditors objected on various grounds but agreed that the sale could proceed without waiving their objections. The auction was held on July 1, 2003 and resulted in a winning bid of $870,000. Because the sale, if approved and consummated, would result in proceeds to the estate well in excess of all secured and unsecured debts (including interest at the default rate under both mortgages), the mortgagees withdrew their objections to the sale.

On June 30, 2003 the debtor filed a plan and disclosure statement providing, in substance, for payment in full of all unsecured debts together with interest at the statutory rate of 9%, and payment in full of all amounts due under both mortgages, with interest to be calculated at the non-default rate provided in each mortgage note. The surplus would be retained by the debtor. The secured creditors objected to confirmation on the ground that they are contractually entitled to interest at the default rate plus attorneys' fees.

It appears that the sale of 141 Main Street has been consummated and the net proceeds are held in escrow by debtor's counsel.

The debtor has at all times been solvent. Prior to September 2002 the debtor's assets exceeded its liabilities by more than double, and after the sale of the building at 141 Main Street for $870,000 and payment

of all its debts, the debtor is left with substantial cash, the building at 139 Main Street of presumably equal value, and no debt. The debtor's monthly rent roll for 139–141 Main Street was $18,800, and the debtor has never claimed that its rental income was insufficient to cover all expenses of the buildings *and* all obligations under the first and second mortgages.

The explanation for the debtor's default from and after September 2002 is that the debtor's principal, Alice Marks Koshar, made "a disastrous investment in a restaurant" in 2001 and experienced financial reverses in connection with the restaurant and a clothing store which she owned and operated. As a consequence, Ms. Marks Koshar explained in her affidavit that "I started borrowing money from the Debtor to pay some of the expenses of my clothing store and the restaurant."

Although the debtor was solvent and could have (A) used its rental income to pay its mortgage obligations or (B) simply sold one of its buildings to pay off both mortgages, instead the debtor filed for bankruptcy for the sole purpose of avoiding its obligation to pay interest at the default rate.[2]

### Discussion

### I. *Default rate interest*

The debtor makes the bald statement that:

> [It] has the absolute right to reinstate the underlying mortgages through the plan process as set forth in Section 1124 of the Bankruptcy Code. This means that all default interest is disallowed, and the debtor is only required to pay, upon confirmation, non-default interest

at the contract rate, together with late fees, prepayment fees, and reasonable attorneys' fees as may be awarded by the Court under Section 506(b) of the Bankruptcy Code.

"Statement of the Debtor in Further Support of Application ..." at p. 2.

■ Debtor's reliance on 11 U.S.C. § 1124 is misplaced. Section 1124 provides in its entirety:

**11 USC § 1124. Impairment of claims or interests**

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or

> (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;

> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such con-

---

**2.** Ms. Marks Koshar states in her affidavits: "The only way that the Debtor could avoid payment of extremely high default interest was to file a bankruptcy petition, and to exercise the Debtor's rights under section 1124(2) of the Code" (sworn to September 3, 2003); "Ultimately, I filed for bankruptcy and submitted a Chapter 11 Plan in order to avoid the 24% default rate" (sworn to November 6, 2003).

tractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Subsection (1) of Section 1124 does not apply, because the debtor's plan does not propose to "leave[ ] unaltered the [mortgagees'] contractual rights" to accelerate the mortgage notes and to interest at the default rate. Subsection (2) of Section 1124 is concerned only with a secured creditor's contractual right "to demand or receive accelerated payment ... after the occurrence of a default." Subsection (2) does no more than permit a debtor to avoid the consequences of an accelerated payment provision if the plan meets all four of the conditions specified in the subdivisions of Subsection (2):

(A) the plan must "cure" any default that occurred before or after commencement of the case;

(B) the plan must "reinstate[ ] the maturity of such claim" as it existed before the default;

(C) the plan must compensate the creditor for any damages incurred; and

(D) the plan must *not* "otherwise alter the legal, equitable, or contractual rights to which" the creditor is contractually entitled.

Nothing in the statute provides expressly or by implication that a debtor has the power to avoid or vitiate a secured creditor's contractual right to default interest by complying with the four subdivisions of Subsection (2). Subsection (2) on its face is concerned only with a contract provision requiring "accelerated payment" upon a default, and the statute permits the debtor to de-accelerate and reinstate the pre-default maturity of the loan only if the plan (D) "does not otherwise alter" the secured creditor's contractual rights.

The Second Circuit decision in *In re Taddeo*, 685 F.2d 24 (2d Cir.1982) does not support the debtor's claimed right to avoid its contractual obligation to pay default rate interest. *Taddeo* concerned a Chapter 13 debtor and the power to cure in order to de-accelerate under Section 1322(b). However, the court also referred to the parallel provision under Chapter 11 in Section 1124(2). In so doing, the Second Circuit employed language recognizing that the purpose of Section 1124(2) was simply to carve out a "small exception to impairment" by changing "a contractual acceleration clause" by curing a default. The court said:

> Having defined impairment in the broadest possible terms, Congress carved out a small exception to impairment in § 1124(2) providing that curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby "impair" a creditor's claim.

There is not a single reference in *Taddeo* to default interest rates, nor is there any suggestion that Section 1124(2) could be construed to modify contractual interest rates *in addition* to a contractual acceleration provision.

Denial of a mortgagee's contractual right to interest at a default rate undoubtedly does "alter" the secured creditor's contractual rights within the meaning of subsection (D) of Section 1124(2). Thus, Section 1124(2), dealing as it does solely with the concept of impairment in the context of an acceleration clause, does not provide a statutory basis for judicial nullification of a contract right to default rate interest.

Section 506(b) of the Bankruptcy Code provides for the allowance of interest on an over-secured claim. It states:

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

The courts have held that determination of pre-confirmation interest is "within the limited discretion of the court." *Key Bank Nat'l Assoc. v. Milham,* 141 F.3d 420, 423 (2d Cir.1998) ("The appropriate rate of pendency interest [interest accrued after the filing of a petition but prior to the effective date of a reorganization plan] is therefore within the limited discretion of the court"); *see also In re Porter,* No. 97–11868 FGC, 1998 WL 272874, at *1, 1998 Bankr.LEXIS 627, at *5 (Bankr.D.Vt.1998) (same); *In re Liberty Warehouse Assocs. Ltd. P'ship,* 220 B.R. 546, 550 (Bankr. S.D.N.Y.1998) (same). Many courts have held in the exercise of their equitable discretion that an oversecured creditor, although entitled to interest under Section 506(b), should not be entitled to receive contractual default rate interest to the prejudice of unsecured creditors where the debtor proposes to "cure" the default by paying the secured creditor all post-default interest at the non-default contract rate. *Cunningham v. American Automatic Sprinkler, Inc. (In re Trinity Meadows Raceway, Inc.),* 252 B.R. 660, 669 (Bankr. N.D.Tex.2000) (the court denied the award of default interest for the period after the order of relief was entered, noting that "other creditors will be harmed if the Court applies the default rate of interest"); *In re Maywood Inc.,* 210 B.R. 91, 93 (Bankr.N.D.Tex.1997) (refusing to allow the default interest rate under equitable concerns where it was "unclear whether the unsecured creditors in this case will

receive any distribution whatsoever"); *In re Consolidated Properties Ltd. P'ship,* 152 B.R. 452, 458 (Bankr.D.Md.1993) (refusing to grant the payment on the default rate of interest since such payment would be "at the expense of junior creditors"); *In re Hollstrom,* 133 B.R. 535, 541 (Bankr. D.Colo.1991) (disallowing the default interest by holding that awarding "an excessive default interest rate" would "serve[ ] as a penalty, or hammer ..., as against other creditors, ..., specifically against unsecured creditors"); *In re DWS Invs., Inc.,* 121 B.R. 845, 849 (Bankr.C.D.Cal.1990) (refusing to allow the default interest under the equitable considerations when "[t]he estate is insolvent and the unsecured creditors are unlikely to receive a distribution unless the Plan is confirmed"). In so holding, courts have often quoted the Court of Appeals in *In re Taddeo,* quoting from legislative history, that "[t]he holder of a claim or interest who under the plan is restored to his original position, *when others receive less or get nothing at all,* is fortunate indeed and has no cause to complain." S.Rep. No. 989, 95th Cong., 2d Sess. 120 (1978), U.S.Code Cong. & Admin.News 1977, 5787, 5906 (emphasis added). *See e.g., In re Forest Hills Assocs.,* 40 B.R. 410, 414 (Bankr.S.D.N.Y.1984); *In the Matter of Madison Hotel Assocs.,* 749 F.2d 410, 419–20 (7th Cir.1984); *In re Manville Forest Products Corp.,* 43 B.R. 293, 302–03 (Bankr.S.D.N.Y.1984) (in context of "lost opportunity costs").

Since the interest rate issue generally arises in the context of de-acceleration under Section 1124(2), many decisions appear to conflate the courts' equitable discretion to determine interest rates to be allowed under Section 506(b) with the statutory power to nullify a contractual acceleration clause under Section 1124(2), articulating the "cure" provision in Section 1124(2)(A) (rather than judicially-created equitable

discretion under Sections 105 and 506(b)) as the legal ground for nullifying the secured creditor's contractual right to default rate interest, in spite of the clear statutory constraint of subsection (D) in Section 1124(2). *See generally, In re Forest Hills Assocs.*, 40 B.R. 410, 415 ("It is ... clear that Code section 1124(2) provides the debtor ... with the statutory tools necessary to effect a total healing of the scars of contractual default, by placing the parties into the same position they were in immediately before the default occurred. . . . Therefore, just as the debtor need not pay the post-default accelerated debt, he need not pay the post-default interest rate on the accelerated debt"); *In re Southeast Co.*, 81 B.R. 587, 591 (9th Cir. BAP 1987) (citing *Forest Hills* ), *aff'd*, 868 F.2d 335 (9th Cir.1989); *In re Johnson*, 184 B.R. 570, 574 (Bankr.D.Minn.1995) (noting that some cases hold that "when the debtor satisfies all elements of § 1124(2), the debtor has cured the default, and therefore need not pay the default rate of interest" and allowing a plan providing the post-petition interest "at the nondefault rate"); *Madison Hotel*, 749 F.2d at 419 ("[S]ection 1124(2) ... provides that 'curing a default, even though it inevitably changes a contractual acceleration clause, does not thereby "impair" a creditor's claim,'" citing *Taddeo* ); *Taddeo*, 685 F.2d at 24. A few courts have treated the statutory right to de-accelerate as giving rise to a statutory right to nullification of the default interest rate, ignoring the clear language of subsection (D) of Section 1124(2), and without regard to equitable considerations. *See, In re Entz–White Lumber and Supply, Inc.*, 850 F.2d 1338, 1342 (9th Cir.1988) ("[B]y curing the default, Entz–White is entitled to avoid all consequences of the default—including higher post-default interest rates"); *Platinum Capital Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070,

1074–75 (9th Cir.2002), *cert. denied*, 538 U.S. 1035, 123 S.Ct. 2097, 155 L.Ed.2d 1065 (2003) (holding the same, even though it involved a solvent debtor); *Citybank v. Udhus (In re Udhus)*, 218 B.R. 513, 518 (9th Cir. BAP 1998) (affirming the denial of the default interest, by finding that "the bankruptcy court correctly followed *[Entz–White]*"); *Southeast*, 81 B.R. at 591 (stating that under Section 1124(2) "cure, reinstatement and reasonable reliance can alter the terms of a contract in Chapter 11 proceedings. . . . '. . . The creditor is ... rightfully categorized as unimpaired, for he is returned to the same position he was in immediately prior to the default, and is thereby given the full benefit of the original bargain' "); *In re Countrywood Inv. Group, Ltd.*, 117 B.R. 338, 339 (Bankr. M.D.Tenn.1990) ("This court adopts the view of ... *[Entz–White* ] and *[Southeast* ] that the curing of defaults at confirmation of a Chapter 11 plan eliminates the consequences of default, including a higher interest rate that was triggered by the debtor's failure to pay installments when due"); *In re Singer Island Hotel, Ltd.*, 95 B.R. 845, 848 (Bankr.S.D.Fla.1989) ("[T]he debtor ... is *not* required to pay [the default interest] ... rel[ying] upon *[Entz–White* ] ... holding that chapter 11 mortgage default cure and reinstatement does [sic] not require payment of default interest"); *Forest Hills*, 40 B.R. at 414–15 (holding that *Taddeo* "clearly establishes that a cure of a default and reinstatement of a mortgage is deemed to return the parties to their status at a point in time prior to the default and acceleration" and thus under Section 1124(2) the debtor "need not pay the post-default interest rate on the accelerated debt").

■ Relying on Second Circuit precedent, this Court takes the view that the authority to nullify a secured creditor's contractual right to default rate interest

cannot be found *as a statutory right* in Section 1124(2), given the express constraint in subsection (D) thereof—rather, such authority rests upon the federal common law equitable power of the court exercising bankruptcy jurisdiction to balance and harmonize the rights of both secured and unsecured creditors. I agree that in most circumstances it is appropriate for the bankruptcy court or superior court exercising bankruptcy jurisdiction to limit a secured creditor to its non-default contract rate of interest in order to provide a distribution to unsecured creditors. But this result is an exercise of the court's equitable discretion; it is *not* a statutory right under Section 1124(2) to which a debtor is entitled without regard to equitable considerations. The decisions of the Second Circuit, and other courts, recognize that in some circumstances where the debtor is solvent and the rights of unsecured creditors are not implicated, it may be inequitable and inappropriate to nullify a secured creditor's contractual, state law entitlement to a default rate of interest.

The Second Circuit dealt with this issue in *Ruskin v. Griffiths*, 269 F.2d 827 (2d Cir.1959), *cert. denied*, 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960), where the Court enforced the creditor's right to the default interest rate. Emphasizing the solvency of the debtor, the Court of Appeals held that it would be "the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act," absent "any unjust delay in the proceedings" caused by the creditor. *Id.* at 832. In so holding, the Court relied on a quote from the Supreme Court's decision in *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946), which stated that "where an

estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor." *Vanston*, 329 U.S. at 164, 67 S.Ct. 237.[3]

*Ruskin* remains effective to date in the Second Circuit and is recognized by other circuits. *Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620 (2d Cir.1989) ("[A]bsent the special circumstances present in *Vanston* [court-induced defaults], no decision of this Court or any New York court has impaired the vitality of *Ruskin*"); *In re Vest Assocs.*, 217 B.R. 696, 702–03 (Bankr. S.D.N.Y.1998) ("The developing consensus is a presumption in favor of the contract default rate subject to equitable considerations.... If a debtor is solvent, there is much more leeway to grant the default rate because other creditors will not be injured"); *In re Vanderveer Estates Holdings, Inc.*, 283 B.R. 122, 134 (Bankr. E.D.N.Y.2002); *In re Dixon*, 228 B.R. 166, 176 (W.D.Va.1998) (reversing the denial of the default interest rate where "the default interest rate is not usurious"; the default interest added to the principal "does not exceed the value of the collateral securing its claim"; and there are no other equitable circumstances such as those in which "junior creditors, secured or unsecured, ... will be prejudiced by an award of the default term"); *Southland Corp. v. Toronto–Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1060 (5th Cir.1998) (affirming the award of default interest, the court noted that "[w]e find it especially significant ... that no junior creditors will be harmed if the Banks are awarded default interest"); *In re Payless Cashways, Inc.*, 287 B.R. 482, 489 (Bankr.W.D.Mo.

---

3. *Vanston* involved the payment of interest on interest while *Ruskin* involved the default rate of interest.

2002) (awarding the default interest, finding "a lack of an equitable basis to deny the [default interest rate]"); *Foss v. Boardwalk Partners (In re Boardwalk Partners)*, 171 B.R. 87, 92 (Bankr.D.Ariz. 1994) ("[T]he claim of an oversecured creditor ... may include interest calculated at a post-maturity default rate, depending upon the equities of the case"); *In re Courtland Estates Corp.*, 144 B.R. 5, 9 (Bankr.D.Mass.1992) ("This Court [previously] ... allowed calculation of interest on oversecured claims with reference to the default rates set forth in the agreements of the parties. Accordingly, this Court will permit the calculation of interest on the Bank's overdue principal at the rate specified in the Note.... As the Debtor has paid all pre-petition unsecured creditors ..., the equities of the case do not compel a different result.... [U]se of [a different rate] would merely provide an undeserved windfall to the Debtor"); *In re Kelton*, 137 B.R. 18, 20 (Bankr.W.D.Tex. 1992) (noting that "[w]hen the estate is fully solvent ... a higher rate may be justified as the only party competing for the dollar sought via the higher interest rate is the debtor itself. In that situation, ... equity dictates that the court enforce the bargain originally struck between the prepetition debtor and the secured creditor"); *In re Hollstrom*, 133 B.R. 535, 539 n. 7 (Bankr.D.Colo.1991) ("In the bankruptcy context, where the debtor is solvent and, therefore, the unsecured creditors would not be harmed by the imposition of a higher interest rate and the contest over default interest involves only a creditor and a stockholder/debtor, payment of the default rate of interest may be proper"); *In re D.C. Sullivan & Co., Inc.*, 929 F.2d 1, 3–4 (1st Cir.1991) (noting that secured creditors are entitled to post-petition interest where the debtor is solvent, citing *Ruskin* ); *In re Consolidated Operating Partners, L.P.*, 91 B.R. 113, 116–17 (Bankr.D.Colo.1988) ("When the debtor is solvent, the equities dictate that additional interest be paid to the secured creditor rather than to the debtor.... The benefit derived from any reduction in the contract rate would not inure to the creditors but instead would be a windfall to the debtor. Such a result would mean that any solvent debtor seeking to avoid the cost of default rate interest could file for Chapter 11. No such result was intended by Congress"); *In the Matter of Chicago, M.S.P. & P.R. Co.*, 791 F.2d 524, 529 (7th Cir.1986) ("We have not forgotten the venerable principle that a bankruptcy court can refuse to award interest that accrues on a creditor's claim after the petition for bankruptcy is filed. But it is designed for cases where there is not enough money to pay all the creditors—so that there is a question whether one creditor should get interest while another doesn't even recover principal—and not for cases like this, where the debtor is solvent") (internal citations omitted); *United States v. Kalishman*, 346 F.2d 514, 518 (8th Cir.1965), *cert. denied*, 384 U.S. 1003, 86 S.Ct. 1913, 16 L.Ed.2d 1017 (1966) ("[I]t is settled that the creditors' rights thereto will be recognized should the estate subsequently prove to be solvent, ..." in context of post-petition interests).

■ In this case the facts do not justify the exercise of equitable discretion by a court to nullify the secured creditor's contract right to interest at the default rate. The debtor was at all times solvent in every sense of the word—the value of the debtor's assets exceeded all its liabilities by more than double, and its income was more than ample to pay all its obligations as they became due, including debt service on both mortgages. The debtor defaulted on both mortgages for the sole reason that the debtor's principal chose to divert the debtor's income to pay for her other busi-

ness ventures. The debtor filed a Chapter 11 petition not to reorganize, or to obtain "breathing space" to become profitable, or to protect the rights of unsecured creditors, or to forestall a foreclosure sale which might have wiped out or eroded equity. The sole purpose of this bankruptcy filing was to nullify the secured creditors' rights to default rate interest. The sole beneficiary of this exercise of judicial power would be the debtor and its principal, who chose to divert the debtor's funds to pay for her other ventures rather than the debtor's mortgage obligations. Neither equity nor any legitimate purpose under the Bankruptcy Code is served by nullification of the secured creditors' rights in the circumstances here presented.

Where the sole purpose of a bankruptcy filing by a wholly-solvent debtor is to avoid its contractual obligation to pay interest at a higher rate after a default, the equitable power of a federal court exercising bankruptcy jurisdiction may not be invoked to nullify rights vouchsafed to a secured creditor under contract and enforceable under state law.

## II. Other issues

### A. Default rate interest under the GAMC mortgage note

■ Although the issue of default rate interest has been the focal point of dispute between the parties since long prior to the debtor's bankruptcy filing, and there have been numerous submissions by the parties in the intervening months, it was not until November 25 that the debtor filed a "Sur–Reply Affidavit in Further Support of Disallowance of Default Interest ..." for the first time annexing a copy of the GAMC promissory note and arguing that GAMC is not entitled to default rate interest under the terms of the note. Although belated, the position is well-founded.

Paragraphs 7 and 11 of the GAMC note are the governing provisions. Paragraph 7 defines an "uncured event of default" and requires GAMC to give the debtor a written notice of default "affording [the debtor] fifteen (15) days to cure a monetary obligation." Paragraph 7 provides in full as follows:

7. **EXPLANATION OF UNCURED DEFAULT AND CONSEQUENCES.** In the event you shall fail to make a monthly installment of interest or fail to pay any other monetary obligation due hereunder ("monetary obligation") within five (5) days of the due date therefore or should you fail to perform any other non-monetary term or provision of this note ("non-monetary obligation") and upon a written notice by certified mail-return receipt requested or by overnight mail (e.g., Federal Express) given by lender to you at 139–141 Main Street, Mount Kisco, New York 10549 affording you fifteen (15) days to cure a monetary obligation or thirty (30) days to cure a non-monetary obligation with additional time to be afforded in the case of a non-monetary default provided reasonable and diligent efforts to cure are being exercised, and provided such monetary obligation or non-monetary obligation, as the case may be, shall then remain uncured following said notice period, such failure shall constitute an "uncured event of default" hereunder. Upon the occurrence of an uncured event of default, your Credit Line hereunder shall terminate, and the lender shall be entitled to accelerate the payment of this Credit Line as if same had matured and to exercise and enforce any and all rights and remedies provided for hereunder or in the second mortgage given to secure this Credit Line. In the event the lender shall elect to accelerate the maturity date by reason of an uncured event of default, then the entire out-

standing principal of your Credit Line advances and interest accrued, together with any other charges and fees required to be paid hereunder, shall become immediately due and payable in full.

The right to a default rate of interest is provided in paragraph 11 of the note and expressly depends upon the existence of an "uncured event of default." Paragraph 11 provides in full as follows:

**11. RATE OF INTEREST IN THE EVENT OF UNCURED DEFAULT.** In the event of any default or foreclosure proceeding hereunder, beyond any applicable cure period, the rate of interest due under this Credit Line shall be two percent (2%) per month ("default rate") and be computed under this obligation until paid in full. This shall include an interest rate computation at this default rate through any date a judgment of foreclosure and sale is paid in full. In the event the Credit Line shall not be paid in full on the maturity date (defined as payment in full of principal advances and accrued interest and other charges outstanding), it is expressly understood and agreed that this Credit Line shall bear interest at the rate of two percent (2%) per month ("default rate") to be due and payable on the first day of each month thereafter until the full Credit Line shall be paid to the GAMC. This shall include an interest rate computation at this default rate through any date a judgment of foreclosure and sale is paid in full.

These two provisions are clear and they are important. Paragraph 7 obligates the secured creditor to give the debtor "written notice" of a default on a "monetary obligation," and the notice must specifically grant the debtor fifteen days to cure such a default. An "uncured event of default" does not occur under paragraph 7 until the monetary obligation remains "uncured *following said notice period*," *i.e.*, following the fifteen-day cure period. Both the right to accelerate the maturity of the indebtedness under paragraph 7 and the right to a default rate of interest in paragraph 11 depend upon the existence of an "uncured event of default," *i.e.*, failure to cure within the fifteen-day-cure period which must be specified in the written notice. Failure to notify the debtor in the written notice of its right to cure the monetary obligation within fifteen days, as required in paragraph 7, prevents an "uncured event of default" from occurring.

GAMC's "NOTICE OF DEFAULT" dated October 28, 2002 did not comply with paragraph 7 of the GAMC note. The first page of the October 28 NOTICE OF DEFAULT stated as follows in its entirety:

Dear Ms. Marks–Koshar:

The purpose of this letter is to advise you that your above referenced loan is now in default for failure to maintain your payments current. As your payment arrears are more than sixty (60) days overdue, in accordance with the Promissory Note of 139–141 Owners Corp., and the primary collateral for the loan consisting of the Guaranty of Payment and Mortgage therefore of Alice Marks–Koshar, the loan may now be accelerated and the Mortgage securing this loan foreclosed.

Very truly yours,

GOLDEN AGE MORTGAGE CORPORATION

BY: /s/_____

Thomas R. Borek

The second page of the October 28 NOTICE simply listed amounts purportedly due for the four months September through December 2002.

The October 28 NOTICE was plainly defective in several respects. It did not constitute a "written notice ... affording you fifteen (15) days to cure a monetary obligation;" indeed, the NOTICE did not inform the debtor that it had any right to cure its monetary default. The October 28 NOTICE advised the debtor that "the loan may now be accelerated," which was not correct, because paragraph 7 provides that an "uncured event of default" and the resulting right to accelerate cannot occur until expiration of the fifteen-day right to cure, which would not have occurred until fifteen days after the October 28 NOTICE, even assuming that that NOTICE had notified the debtor of its right to cure, which the NOTICE did not. In addition, the October 28 NOTICE was defective by reason of the amounts stated to be owed in respect of September, October, November and December as set forth on a sheet which apparently was enclosed with the NOTICE. Aside from the fact that only September and October could have been due and owing as of October 28, the varying amounts said to be due for each of the four months listed on the sheet was plainly erroneous.[4] Moreover, the default rate provided under paragraph 11 applies only to "any default ... beyond any applicable cure period;" in other words, the default rate would not have applied under paragraph 11 until expiration of the fifteen-day notice to cure which the October 28 NOTICE should have included, but did not.

In short, GAMC's October 28 NOTICE OF DEFAULT did not comply with the requirements of paragraph 7 of the GAMC promissory note and, accordingly, was ineffective to trigger either a right of acceleration under paragraph 7 or a right to default rate interest under paragraph 11.

### B. *Attorneys' fees*

■ Although DSC and GAMC are under common ownership, and although the same individual submitted multiple affidavits as an officer of both entities, and although the only material issue in the case (the right to default rate interest) was common to both DSC and GAMC (until the debtor's November 25 submission asserting for the first time an objection to GAMC's right to default interest under the terms of the GAMC note), each of the mortgagees has utilized separate counsel throughout the debtor's bankruptcy. Since the legal costs demanded by both mortgagees are substantial, the debtor rightly objects to the employment of two separate law firms as duplicative, unreasonable and excessive. At no time was there any conflict of interest, or differing interest, between DSC and GAMC. The fact that an issue was raised as to whether the debtor had tendered a payment to GAMC to cure its default in early November 2002 which was not relevant to DSC (or GAMC, as it turned out), and that the debtor belatedly asserted a successful defense to GAMC's default interest claim based on the terms of the GAMC note, did not give rise to any conflict or material difference of interest between DSC and GAMC such as would disqualify the same set of attorneys from representing both mortgagees.

Of course, if Thomas Borek, the officer of both entities who submitted affidavits on behalf of both entities, saw fit to hire two sets of attorneys it was his prerogative to

---

4. For example, the monthly rate of interest on $75,000 principal would equal approximately $1,000. The amounts said to be owed for September, October, November and December on the sheet annexed to the October 28 notice were $1,575, $1,606.50, $1,638.63 and $1,671.40, respectively. Even at the default rate of interest of 24% per annum, or approximately $1,500 per month, these figures are plainly excessive.

do so. But the identity of ownership, interest and issues between DSC and GAMC was such that it would be inequitable and unjustifiable to impose on the debtor the legal costs incurred for both sets of attorneys.

◾ Moreover, there are two additional grounds for denying GAMC's application for attorneys' fees and costs. The first ground is contractual. Paragraph 10 of GAMC's promissory note provides as follows:

> 10. **ATTORNEY'S FEES.** In the event it shall become necessary for the GAMC to employ counsel to effect collection of this Credit Line, you agree to pay to the GAMC reasonable attorneys' fees in addition to all other costs, allowances and additional allowances as provided by law.

The second relevant provision is paragraph 17 under a rider to the GAMC credit line mortgage. Paragraph 17 provides as follows:

> 17. In the event the Mortgagor shall be in default under any provision of this Mortgage Deed or any instrument delivered by the Mortgagor in connection therewith, and as a result, the Mortgagee shall require and employ attorneys or incur other expenses to collect any payments due or to become due or enforce performance or observance of any obligation or agreement on the part of the Mortgagor contained herein (whether or not suit be brought), the Mortgagor shall, on demand, pay the Mortgagee the reasonable fee of such attorneys' [sic] and such other expenses so incurred by the Mortgagee, which counsel fees, costs and disbursements shall be added to the indebtedness secured by this Mortgage Deed and shall be secured by the lien of this Mortgage Deed. It is further agreed by the Mortgagor that on the foreclosure of this Mortgage Deed there shall

be included in the computation of the amount due the amount of a fee for attorneys' services in the foreclosure proceedings, as well as all disbursements, allowances and additional allowances, and costs provided by law.

The key element in both paragraphs 10 and 17 to entitle GAMC to shift its legal costs to the borrower is that it must be "necessary" or "require[d]" in order for GAMC to "collect" or "enforce" its due under the GAMC note and mortgage. Paragraph 10 permits fee shifting only if "it shall become *necessary* for the GAMC to employ counsel to *effect collection* of this Credit Line;" paragraph 17 permits fee shifting only where GAMC "shall *require*" counsel "*to collect* any payments *due* or to become due or enforce performance" of the debtor's obligations.

The undisputed fact is that it was *not* necessary for GAMC to hire counsel to "collect" its indebtedness "due" from the debtor. Beginning with the debtor's tender in early November of a check which was more than sufficient to cover its arrears to GAMC but which GAMC returned without attempting to cash, followed by the letters from the debtor's counsel dated December 30 and January 3 iterating and reiterating the debtor's intent to sell one of the properties for an amount far in excess of the secured debt owed to both mortgagees, and in all subsequent negotiations between counsel for the parties, the debtor made clear its purpose and intent to sell 141 Main Street and pay off its entire indebtedness to both DSC and GAMC. After commencement of this bankruptcy case the debtor promptly made clear its intent to sell 141 Main Street and pay off its mortgage debts in full by filing its motion under Section 363 to sell the property within two weeks after filing its Chapter 11 petition. In short, GAMC knew at all times that it was quite unnecessary for it to

employ counsel for the purpose of collecting its debt from the debtor. Of course, GAMC was entitled to hire counsel if it wished either before or after the debtor's bankruptcy filing. But it is not entitled to shift its legal costs to the debtor under the express terms of paragraphs 10 and 17, quoted above, in circumstances where there was never any doubt that the debtor had the intention to pay off its indebtedness and the ability to do so by selling 141 Main Street.

The second ground for denying GAMC's application for legal costs is that the sole reason for employing counsel was to assert a claim for default rate interest to which GAMC was not entitled under the express terms of paragraphs 7 and 11 of the GAMC note, for the reasons set forth above. By their express terms, paragraphs 10 and 17 of the GAMC note and mortgage make clear that the right to recover attorneys' fees from the borrower arises only where the employment of counsel is necessary to collect money or other performance which is "due" under the note and mortgage. Default rate interest never became "due" because of the patent defects in GAMC's October 28 NOTICE OF DEFAULT. GAMC may not recover the legal fees incurred in its unsuccessful attempt to force payment of default rate interest to which it was not entitled under the terms of its note.

 None of these objections applies to the application for legal fees filed on behalf of DSC. Substantially all of DSC's legal expenses were incurred in connection with the debtor's bankruptcy, which was filed for the sole purpose of defeating DSC's right to default rate interest. The only substantive objection to DSC's application for attorneys' fees is that "a lender is not entitled to compensation for legal fees incurred in attempting to prevent reinstatement of a mortgage under section 1124 of the Bankruptcy Code" (submission dated December 8, 2003). The problem with this argument is that debtor's bankruptcy filing was not for the purpose of "reinstatement of a mortgage;" as repeatedly conceded by the debtor's principal and counsel, the purpose of the bankruptcy filing was to sell the property, pay off the mortgage debt and, most particularly, nullify the debtor's contractual and state law obligation to pay default rate interest. DSC's legal fees, while high in relation to the amount at stake, were necessary in order to defend against an unwarranted bankruptcy filing and vindicate its contractual right to default rate interest.[5]

DSC will be awarded attorneys' fees and costs limited to an aggregate amount of $30,184.33 as set forth in its November 21, 2003 submission.

\* \* \* \* \* \*

After conferring with the attorneys for the debtor and GAMC, counsel for DSC is instructed to prepare an appropriate order or orders consistent with this Decision and submit the same to the other attorneys for approval as to form, without prejudice to any party's right to appeal. Any disagreements as to form of the order(s) will be resolved by the Court either in a telephone conference with all counsel or at a hearing in open court.

---

5. As already noted, the sole purpose of the debtor's bankruptcy filing was to nullify the mortgagees' claims to default rate interest by invoking Section 1124(2) of the Bankruptcy Code. The debtor did not need to file for bankruptcy to defend a claim for default rate interest by GAMC based upon the defects in GAMC's October 28 NOTICE OF DEFAULT.